DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Kevin D. Morrison has appealed from a decision of the Summit County Court of Common Pleas. This Court affirms.
 I {¶ 2} On February 20, 2003, Appellant was indicted by the Summit County Grand Jury on three counts of rape with force, in violation of R.C. 2907.02(A)(1)(b); two counts of gross sexual imposition, in violation of R.C. 2907.05(A)(4); and two counts of disseminating matter harmful to juveniles, in violation of R.C.2907.31. The victims of Appellant's crimes were the son and daughter of Appellant's girlfriend, J.S. and M.S., ages ten and nine, respectively. Appellant pleaded not guilty to the crimes as charged in the indictment and the matter proceeded to a jury trial. The jury found Appellant not guilty on one count of rape, as it applied only to J.S. However, Appellant was found guilty of all the remaining counts.
 {¶ 3} A sexual predator hearing and sentencing hearing were held. The trial court adjudicated Appellant a sexual predator and he was sentenced to a definite term of life imprisonment on each count of rape; one year of imprisonment on each count of gross sexual imposition; and one year of imprisonment on each count of disseminating matter harmful to juveniles. The trial court ordered the sentences for each count of rape to run consecutively. It further ordered the sentences for the remaining counts to run concurrently with the sentences for rape.
 {¶ 4} Appellant has timely appealed the trial court's decision, asserting three assignments of error.
 II Assignment of Error Number One
"Appellant's convictions were against the manifest weight of the evidence."
 {¶ 5} In Appellant's first assignment of error, he has argued that his convictions were against the manifest weight of the evidence. This Court disagrees.
 {¶ 6} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 7} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id.
 {¶ 8} In the case sub judice, Appellant was convicted of two counts of rape, in violation of R.C. 2907.02(A)(1)(b), which provides: "No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." (Alterations sic.) He was also convicted of two counts of gross sexual imposition, a violation of R.C. 2907.05(A)(4). That statute provides, in relevant part:
"(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
"* * *
"(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."
 {¶ 9} Appellant was additionally convicted on two counts of disseminating matter harmful to juveniles, a violation of R.C.2907.31(A)(1). That statute provides:
"(A) No person, with knowledge of its character or content, shall recklessly do any of the following:
"(1) Sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile any material or performance that is obscene or harmful to juveniles[.]"
 {¶ 10} This Court has previously explained that for a jury to convict a defendant for a violation of R.C. 2907.31(A)(1), the State must prove beyond a reasonable doubt that the defendant: 1) recklessly 2) disseminated or presented 3) any harmful material 4) to the victim 5) who was a juvenile. State v. Mayes (July 26, 2000), 9th Dist. No. 99CA007388, at 9. Relying on R.C.2907.01(E)(2), this Court has further held that "[m]aterial is harmful to a juvenile if it is offensive to the prevailing adult community standards concerning suitable material for juveniles and it contains a display or description of sexual activity." Id.
 {¶ 11} Appellant has argued on appeal that his convictions for rape, gross sexual imposition and disseminating matter harmful to juveniles was against the manifest weight of the evidence because "[t]he only evidence presented to substantiate the charges was the testimony of the two alleged victims. No corroborating physical, forensic, or medical evidence was presented. [M.S.] showed no physical or behavioral symptoms commonly associated with sexual abuse. * * * The children's mother herself told [the investigating nurse] that the children had a long history of lying and had trouble telling the truth."
 {¶ 12} After reviewing the entire record, this Court finds Appellant's arguments without merit. Although Appellant is correct in his assertion that the State lacked any physical evidence to show that Appellant sexually abused M.S. and J.S., the jury was presented with a wealth of other evidence to overcome any doubt that the children, were sexually assaulted by Appellant and that Appellant provided them with "material or performance that [was] obscene or harmful to juveniles." (Alterations sic.) R.C. 2907.31(A)(1).
 {¶ 13} At trial, M.S. presented compelling testimony regarding the sexual abuse that took place in her home. M.S., who was eleven years old at the time she testified at trial, explained that her mother had met Appellant "[o]n the computer." M.S. stated that Appellant later moved into the home she shared with her mother and her older brother, J.S.M.S. testified that when she first met Appellant she "[got] along with him" and that she frequently referred to Appellant as "Dad." M.S. further explained that sometimes her mother would go to a friend's house or to the grocery store, leaving her and her brother alone with Appellant.
 {¶ 14} M.S. stated that the first time that Appellant touched her they were sitting on a bed in the bedroom that Appellant shared with M.S.'s mother. M.S. testified that Appellant was dressed in a pair of boxer shorts and they "were playing wrestling in the bedroom, in his bedroom, and [Appellant] was in his boxers and his private fell out and I went down to tell my mom * * *." M.S. explained that when Appellant's penis fell out of his boxer shorts, "[h]e grabbed [her] hand and he made [M.S.] touch it." M.S. responded by "[trying] to yank away."
 {¶ 15} M.S. testified that two days after the first incident, Appellant "made [her] touch [his penis] more." M.S. testified to other incidents that occurred in the home. M.S. explained that sometimes when she was with Appellant in his bedroom he "would make [her] get on top of him and start going fast." In those instances, Appellant would sometimes give M.S. magazines that he kept under his bed in a drawer. M.S. described the magazines as "[b]ad magazines[,]" which depicted "[p]eople having sex and things like that." When asked if the magazines said anything, M.S. replied that "[o]ne of the magazines in the picture it said a bad word and the word started with F*** [and then it said me]." M.S. also stated that sometimes Appellant would show her and her brother "[b]ad pictures" on the computer. She explained that some of the words on the computer were "[h]ard-core stuff and I think school girl."
 {¶ 16} M.S. described another incident that took place with Appellant. She stated that Appellant "made [her] get in the shower with him." While in the shower, "[Appellant] made [her] wash his private" and "[h]e made [her] put [her] mouth on [his penis]." M.S. further testified that Appellant made her perform oral sex on him on several other occasions. M.S. stated that sometimes Appellant would ejaculate when she performed oral sex on him.
 {¶ 17} M.S. testified that Appellant "would try to put his thingy [into her vagina]." She further stated that Appellant also inserted "[h]is pinky[,]" into her vagina and that "[i]t hurt." M.S. also stated that Appellant made her put a vibrator into her vagina. On some days, explained M.S., her older brother, J.S. would be in the home when Appellant performed certain sex acts on her. On one particular occasion, Appellant "told [J.S.] to try to put his thingy inside of [her]" too.
 {¶ 18} Later in her testimony, M.S. explained that Appellant made her play a game called "riding horsey." To play this game, Appellant would dress M.S. in her favorite dress and "[s]tocking things, they were knee highs" and then forced her to sit on top of him while he was naked. M.S. explained that when they played "riding horsey" she "was sitting on [Appellant's penis]" and she "would like move up and down. * * * Like jumping like the horse was like jumping and [she] would — you go up and down on a horsey's back[.]"
 {¶ 19} M.S. also presented testimony concerning other sexual games Appellant forced her and her brother to play. She explained that she played "stripping poker kind of game" with Appellant. The game "was kind of like war and whoever had the biggest card they would get to keep their clothes on, but the one who didn't they would have to take off a piece of their clothing." M.S. explained that when you lost the game "[you] would have to turn around slow, stand up and turn around slow" while you were naked. M.S. testified that sometimes she won, and sometimes she lost the game. The children were also forced to play "doctor[.]" M.S. explained:
"It was a game and when we played [J.S.] was like my husband or whatever. * * * [W]hen we went to the doctor's office it was kind of weird because [Appellant] — well, I told [Appellant] I had the stuff coming out of my private and I read it in a book now and it means that you can start your period any time and I didn't know then and so I asked [Appellant] about it and he told me maybe [J.S.] could help by putting his thing inside me."
 {¶ 20} M.S. testified that Appellant liked to use women's pantyhose. During direct, the following discussion took place:
"[The State:] [M.S.], did you ever see nylons in the bedroom?
"[M.S.:] Nylons?
"[The State:] Or pantyhose?
"[M.S.:] Yes.
"[The State:] And where were those?
"[M.S.:] In my mom's drawer.
"[The State:] And did you ever see [Appellant] do anything with them?
"[M.S.:] Yes.
"[The State:] And what would he do with them?
"[M.S.:] He would put them on his private and rub it up against it. * * * He would rub it up against his private and the sperm would come out.
"[The State:] Okay. Did that ever happen in front of you?
"[M.S.:] Yes.
"[The State:] How many times?
"[M.S.:] A lot."
 {¶ 21} On cross-examination, M.S. testified that before Appellant began to sexually molest her, he was mean to her and her brother. Appellant would yell at her and her brother, and sometimes Appellant would even spank them. M.S. further testified that before Appellant began to touch her, she did not like him because he tried to discipline her and her brother. She explained: "[Appellant], when he first came [to live with her family], he would only drink a little bit, but when we moved into the other place he would drink, like, a lot and one time he picked me up by my neck." She further testified that Appellant had been sexually molesting her for approximately a year and a half before she finally told her mother in a grocery store. M.S. explained that she did not know that what Appellant was doing to her was wrong. She stated that "[her] mom never taught [her] that it was wrong."
 {¶ 22} M.S. admitted on cross-examination that because her room was adjacent to the bedroom her mother shared with Appellant, she could hear Appellant and her mother talking about "dirty things and dirty phrases and nasty things."
 {¶ 23} M.S.'s older brother, J.S. also testified at trial. J.S. explained that he was no longer living with his mother, but instead was living with foster parents in Akron, Ohio. J.S. stated that he did not like Appellant when he initially moved in "[b]ecause he always used to whop [them] and pick [them] up by [their] necks and stuff." J.S. explained that Appellant viewed "nasty stuff" on the computer and that he would sometimes show J.S. He stated that "[t]here were people butt naked and teacher pets and stuff he called them and then they were naked and stuff sucking on each others things and stuff like that." J.S. stated that he did not want to look at the images, but he did so "[b]ecause [Appellant] made [him]." J.S. further explained that Appellant showed him magazines that contained "[n]asty stuff." According to J.S., sometimes Appellant would slide the magazines under the children's bedroom doors.
 {¶ 24} J.S., as did his sister during direct examination, testified that Appellant made them play "doctor" and strip poker. He explained:
"When we played doctor he made us take off all our clothes and everything and he made us take off all our clothes, sometimes, once, this happened once when we were playing doctor he said we play some clothing poker or something like that.
"* * *
"We played this strip poker and then whenever the lowest card you have to take off a piece of your clothing and whoever loses their clothing first they have to stand up and turn around three times."
 {¶ 25} J.S. testified that when the children refused to play the games, Appellant coerced the children into playing by telling them "that if [they] didn't do it that he would tell [their mother] a big lie and [they] would get in trouble."
 {¶ 26} J.S. also described the first time that Appellant touched him sexually. He stated: "[Appellant] went and asked me if I wanted to do something fun and I said yes and he said take off your clothes and stuff like that and we started playing and then I was in my underwear and he started touching me and stuff like that." J.S. said he did not remember touching Appellant, but he testified that his sister did and that she "sucked [Appellant's] weenie"; J.S. later admitted that he also touched Appellant's penis. J.S. further testified that he was present when his sister was engaged in sexual activity with Appellant; she was sometimes nude or wearing a dress with nylons.
 {¶ 27} J.S.'s testimony further corroborated M.S.'s testimony. He stated that he was present when Appellant "put sperm all over [his] sister." He also stated that Appellant "made [him] put [his] thingy in [M.S.'s] thing." At that time, Appellant had "turned on this movie and stuff and then it was a nasty movie and then he made [them] take off [their] clothes and [J.S.] had to put [his] thingy in [M.S.'s] thingy. * * * [M.S.] was laying on the floor and [J.S.] had to sit on top of her and her legs were spread open." J.S. stated that he told Appellant that he "didn't like it[,]" but Appellant "wouldn't quit."
 {¶ 28} J.S. testified that Appellant owned a "massage thing" and that Appellant told him to "stick it in [M.S.] and he said stick it in him and it feels good and [M.S.] told [him] in private it felt weird and nasty." J.S. further stated that he saw Appellant put nylons on his "thingy." J.S. said that "[Appellant] was pushing [the nylons] up and down." Appellant made J.S. use the nylons too. J.S. stated that he tried to tell his mother about the sexual abuse, but he was "too scared." J.S. was afraid that "[Appellant] was going to hurt [him] or [his] mom or [his] sister." J.S. decided to tell his mother what Appellant was doing to him and his sister because "enough was enough, [now they] had to tell her or things would get worse." J.S. further stated that he currently had two counselors that he saw on Mondays.
 {¶ 29} On cross-examination, defense counsel asked J.S. if he remembered what he talked about with his mother on the day he finally told her about the sexual abuse. Specifically, defense counsel asked J.S. if he "remember[ed] your mom talking to you and your sister about whether or not you guys should leave [Appellant] or if you should make [Appellant] go live somewhere else?" and J.S. replied: "Yes." J.S. also explained that when his mother suggested leaving Appellant, he agreed that she should leave him.
 {¶ 30} J.S. testified that after he told his mother about the sexual abuse, his mother:
"[S]lammed on the brakes while she was in the parking lot and she said what and then she stopped and she turned around and drove to Aunt Ann's and then she went and started crying at Aunt Ann's and Aunt Ann said we had to call the police and we went to the police department to tell [Detective] Shannon [Davis]."
 {¶ 31} Defense counsel also asked J.S. why he never told his counselors about the sexual abuse taking place in his home. J.S. responded: "Because, because I was too embarrassed." J.S. also admitted that he told his counselor or a nurse that he sometimes heard and saw things that were not there.
 {¶ 32} On redirect examination, the State asked J.S. if he was "telling us that these things happened to you, these nasty things happened to you because they happened or because you want to get back at [Appellant]?" J.S. replied: "I don't know. * * * I'm just telling the truth."
 {¶ 33} The victims' mother, Marina Rivera, also took the stand Mrs. Rivera explained that she met Appellant on the internet; they talked via the internet for approximately three months before she finally met him in person. She stated that Appellant made his first trip to see her with a friend, and that he stayed for two days. On the third trip to see Mrs. Rivera, Appellant moved into her home. When Appellant initially moved into Mrs. Rivera's home, she was not working and he was working at a factory, from 3:00 p.m. to 11:00 p.m. Mrs. Rivera testified that Appellant would be alone with the children when she visited a friend's home or grocery shopping. During the summer months, when the children were not in school and Mrs. Rivera was out of the home, Appellant would watch the children. Mrs. Rivera explained that when she did leave the home to go to a friend's or shopping, the children would beg her to take them with her. At these times, Appellant told Mrs. Rivera that the children could stay with him. The children, Mrs. Rivera explained, initially got along with Appellant. But as time progressed, "[Appellant] started drinking heavily and he started to get mean with them."
 {¶ 34} Mrs. Rivera testified that she learned about the sexual activity that was taking place between her boyfriend and her children in December 2001. She explained that she was in the grocery store shopping and she heard the children whispering behind her. They refused to tell her what they were talking about, so she took them to her car and it was there that they told her about what Appellant was doing to them. Mrs. Rivera stated that she then drove her children to her best friend's house, Ann Goddard, and from there she took them to the police department. The children were taken to a hospital approximately three weeks later.
 {¶ 35} Mrs. Rivera stated that she knew Appellant owned pornographic magazines and that he kept them in a locked drawer under their bed. She explained that she talked to Appellant about keeping the drawer locked because she did not want her children opening it. Mrs. Rivera later explained on cross-examination that although she told Appellant to keep the drawer containing the pornographic magazines locked, it was possible the drawer was not locked and that the children could have viewed the magazines without Appellant's knowledge. Mrs. Rivera further stated that she personally viewed the contents of one of the magazines and it depicted men and women having sex and women having sex with other women. Appellant also kept "toys" in the drawer. Mrs. Rivera described the "toys" as "a couple of dildos and something[.]"
 {¶ 36} Mrs. Rivera admitted on cross-examination that J.S. had a long history of psychological and psychiatric problems; J.S. started seeing a psychiatrist when he was two years old. Mrs. Rivera further admitted that J.S. had attention deficit disorder, disassociative disorder, he suffered from psychotic features, and he had been diagnosed as bipolar. Mrs. Rivera stated that prior to Appellant moving into her home, J.S. had hallucinations about a man and a dog chasing him. J.S., Mrs. Rivera stated, was also aggressive at times and she was having trouble disciplining him.
 {¶ 37} Mrs. Rivera testified that during the time the children were sexually abused by Appellant she never noticed any marks or bruises on their bodies which would indicate sexual abuse. She also admitted that when the children initially told her about the abuse she "had [her] doubts at first" because her children "lied quite a bit." Mrs. Rivera also explained that before Appellant moved into her home, M.S. liked to "get dressed up" by putting on her mother's make-up, "clicky shoes" and nylons.
 {¶ 38} Donna Abbott, a nurse practitioner in the CARE Center at Akron Children's Hospital, explained that she "perform[s] evaluations on children that present with allegations of abuse, primarily most of the children [she] see[s] are victims of sexual abuse or sexual assault." Mrs. Abbott, along with Mrs. Elizabeth Morstatter, a CARE Center social worker, was present for the initial interview with M.S. on December 20, 2001; however, she was not present during the interview with J.S. Reading from her medical notes, which were taken during her interview with M.S. and written to reflect M.S.'s exact words during the interview, Mrs. Abbott stated the following:
"[M.S.] said [Appellant] would make her and [J.S.] try to do what he saw on the computer.
"He had boxers on and flap came open and his private came out and he made me touch it, it was disgusting.
"She said she didn't want to touch his private, but he actually forced my hand to touch it.
"When asked what his private did she said it just flopped over.
"* * *
"When asked if she ever saw the squirted part she said he did it in front of me and [J.S.] and she said dark white stuff would squirt out and he would make me touch it.
"* * *
"She said he would put her finger on [Appellant's penis], would move it around and he would lick the sperm off her finger. She said he would also put the sperm on her finger and make her put it in her mouth.
"She said he would put a nylon on his private before he did that and then rub his private up and down.
"* * *
"When asked if she was ever made to make the sperm come out she said he would make her rub it up and down, she would pull her hand back and he would do the rest.
"She said she touched his private two times.
"When asked if his private ever touched her she said one day [J.S.] was at [school] he made me get into a dress with no underwear and put stockings on and he took his boxers off and he made me get on him and made me act like he was riding a horse.
"* * *
"She said after that he made her get in the shower with him and wash his private and then make her lick it. She said when this happened it went straight up and got hard. When asked if she has ever licked anybody else's private, she said that [Appellant] would make her lick her brother's and she had to get on top of her brother and do the horsey.
"She said that he also saw something in a magazine and I had to put my butt on his face and lick his private. She said that when he saw the thing in the magazine he said wouldn't this be fun.
"* * * [She] said he tried to stick his pinky in it, referring to her [vagina].
"She said he tried to put his weenie in the hole where the babies come out. She say[s] it hurt. There was no blood that came out of it after that, it was red.
"When asked what made it red she said he was forcing it in but it wouldn't go in. She said he would put his hands on it, * * * and make it go up and down and make it hard and he said that the harder it is, the easier it is to go into the girl."
 {¶ 39} Still reading from the medical records generated during her interview with M.S., Mrs. Abbott further testified that:
"[M.S.] talks about [how Appellant] told her and [J.S.] to do it, but when she got on top of [J.S.] we bent the weenie down so when I was on top of him we actually — we weren't actually doing anything so we lied to him.
"She said [Appellant] would make [J.S.] do the same thing to his weenie, but sperm didn't come out, only pee. It went on the floor because he is too young for sperm.
"She said that [Appellant] would look at pictures on the computer and make her and [J.S.] do the things he saw in the pictures.
"Sometimes they told him no and they went to play.
"She said that one time he wanted to play a game with them and said it didn't have anything to do with sex. She said it was a card game and the last person to lose a card had to take a piece of clothing off.
"She said that once all of the clothes were off they would have to get up and turn around and sit back down and spread their legs.
"* * * [S]he said he bought a toy. She said it was straight and it looked like a weenie and it vibrated and he stuck it in and took it out. He told me to put it back in, but I didn't.
"She said after she did that he picked it up and licked it.
"She said [the toy] had a remote on it with levels of vibrating and he told me if I move something by where I pee until white stuff comes out that it would really feel good but I didn't.
"She talks about how they would play doctor with [Appellant] and that's really all that I have about types of contact that there were."
 {¶ 40} Mrs. Abbott also completed a physical exam of M.S.'s body and the exam was "completely normal[,]" there were no abnormalities. Mrs. Abbott explained that "[i]t's very common for a child to describe the type of acts that [M.S.] described and have a perfectly normal physical exam, especially when we don't see them, again, within 72 hours of the last occurrence." Although not present for his interview, Mrs. Abbott also performed a physical exam on J.S.J.S.'s exam was also normal. Although there was no signs of sexual abuse, Mrs. Abbott stated that she believed that both J.S. and M.S. were victims of sexual abuse. Mrs. Abbott admitted on cross-examination that there was no evidence of semen or bodily fluids or physical trauma to the bodies of both victims.
 {¶ 41} Mrs. Elizabeth Morstatter, the social worker that interviewed J.S. and M.S. at the CARE Center, discussed the contents of her interviews with the children. Mrs. Morstatter explained that during M.S.'s interview she instructed M.S. to draw pictures to describe what Appellant did to her. M.S. drew a picture of a computer, a picture of J.S.'s and Appellant's genitals, and a picture of what M.S. referred to as a "speed thermometer[,]" which she described as "something that vibrates that [Appellant] would put in her." As to J.S., Mrs. Morstatter stated that J.S. was cooperative during the interview, and, at times, he would get tearful. The social worker further testified that J.S. told her that Appellant forced them to do "nasty things[,]" which J.S. explained as "getting naked and stuff." J.S. told Mrs. Morstatter that he and his sister:
"[W]ould have their clothes on and they would have to put a card down and the high card would get to keep their clothes on, the lowest two took off a piece of clothes, and he said two people would lose. They would have to get up and turn around naked.
"He said that [Appellant] made [his] sister touch him in nasty places, it was nasty, and that he was scared to tell his mother.
"* * *
"He said he would — that [Appellant] would take the pink thing that shook and be sticking it up this hole down in her private, meaning [M.S.'s] private.
"[J.S.] said it made mommy cry when they told his mother about what [Appellant] had been doing.
"[J.S.] talked about playing doctor and he said [Appellant] told them I'll make up a lie if we told our mom.
"* * *
"[J.S.] said [Appellant] had him suck him and made [M.S.] got on top of my back and jump. * * * He said he wanted Appellant in jail because he thought is was assault.
"[J.S.] said he had to suck [Appellant's] little circle things on his chest and his sister sucked the little circle things and the private part in the front and made me suck it.
"* * *
"[J.S.] said [Appellant] had stockings for girls to put on that he kept in what you call it pinball things and that [Appellant] had gone to a special shop to get the pink thing for the hole."
 {¶ 42} Mrs. Morstatter testified that J.S. told her that he did not remember viewing any nude pictures on the computer at his home. Mrs. Morstatter explained on cross-examination that M.S. told her that she had learned "various sexual things" from watching television. The victim's mother also told Mrs. Morstatter that the children had trouble telling the truth and that she had "reasonable doubt" regarding the truth of the children's accusations.
 {¶ 43} J.S.'s case manager, Mrs. Kim Jones-Baker ("Mrs. Baker"), testified that J.S. was referred to her because he had been released from a psychiatric hospital and was starting to show signs of depression and instability. Mrs. Baker stated that the first time she heard about sexual abuse going on in the children's home was after the children told their mother. Mrs. Baker explained that after she learned of the sexual abuse she talked to J.S. and his mother. J.S. told her that he felt like "`a bad kid because he didn't protect his sister' from the alleged abuse." J.S. also told Mrs. Baker that "he was hearing a voice which was telling him to hurt himself. He reported that the voice was [Appellant's] and would tell him to hurt himself, would tell him that he was no good, that he was a bad kid, that he should kill himself." Eight months after the sexual abuse came to light, J.S. told Mrs. Baker of another memory he had concerning Appellant. Mrs. Baker explained:
"My notes state that [J.S.] shared information about [the] alleged incident when [Appellant] forced him to look at, quote, `dirty pictures' on the computer and had him suck one of those things you wear when you don't have babies after he had used them.
"[J.S.] recalled one picture on the computer of a teenage boy and an older man in a classroom setting. [J.S.] stated that the boy was on two desks pulled together, and the man was on top, neither was wearing clothes.
"[J.S.] was not able to recall any other pictures specifically but stated that they were, quote, `all the same stuff' and that [Appellant] had created his own web page with this type of pictures.
"[J.S.] stated that [Appellant] had him up in his mother's room while mom and sister was away and had taken off his and [J.S.'s] clothes.
"[Appellant] allegedly took a condom out of the dresser, put it on, touched himself, until, quote, `it had stuff in it' and made me suck on it and drunk the stuff out of it.
"[J.S.] also stated that [Appellant] told him things that he did to his mother, quote, `sucking her titty, licking her pussy' and, quote `fucking her' and told about [J.S.] doing these things to this sister."
 {¶ 44} Mrs. Baker testified that she believed that J.S. waited eight months to tell her about the aforementioned memory because "[J.S.] didn't want to share it. It was humiliating. It was unsolicited. I didn't ask him so it's not unusual for a kid not to want to share this type of information."
 {¶ 45} Reading from a report written by J.S.'s psychologist, Mrs. Baker testified on cross-examination that "[J.S.] demonstrated preoccupation with violent themes and a strong revenge motive." Mrs. Baker explained that she did not necessarily agree with that diagnosis, but that she was working with J.S.'s ability to cope with conflict and his impulsive behavior.
 {¶ 46} During the State's case-in-chief, a deposition of Nora Cord was read into the record. Mrs. Cord, an outpatient therapist at Child Guidance Centers, testified that M.S. was referred to her by a supervising psychologist; the first time she saw the child was March 14, 2002. Mrs. Cord explained that M.S.'s "presenting problem" when she came to her was "behavioral issues as well as some mood disturbances. [S]he had recently — about four months before coming in, [h]ad been diagnosed as bipolar and was also having some sleep disturbances, some hypervigilance, things that we see pretty classically along the lines of Post-Traumatic Stress Disorder." Mrs. Cord later explained that:
"Post-Traumatic Stress Disorder is a DSM-4 diagnosis that is given to people who meet the criteria of either witnessing or experiencing a traumatic event in which they could not stop it, control it, or change it in any way. They also have sleep disturbance, hypervigilance, being on guard always, a foreshortened sense of life, not being able to think ahead and into the future as well as having a number of other criteria that meet the category for which I can't completely recall at this time."
 {¶ 47} During some of the sessions Mrs. Cord conducted with M.S., the child would discuss her abuse through the pictures she drew or through games she played with Mrs. Cord. On one occasion, M.S. told Mrs. Cord that she felt "helpless because she couldn't stop." The feeling of helplessness, Mrs. Cord explained, was a common feeling in children who had been sexually abused. In another session, M.S. drew a picture and told Mrs. Cord that "[Appellant] made [her] lick his penis and he squirted sperm on [her] belly." Mrs. Cord also provided the child with pictures of blank figures that are used "with children who have been sexually abused to help them identify what actually occurred and where it occurred on their bodies." Using the blank figures, M.S. diagrammed all of the sexual acts Appellant committed against her. While looking at the picture, Mrs. Nord explained what M.S. had drawn.
"She [said] that — that — to put his thingy in my mouth, put sperm on me and the sperm would dribble and she's talking about on her chest area. With her hands being marked, she said she had to get in the shower and scrub the thingy, touch it and grab it with her hands.
"In terms of her vaginal area, she says that that was touched with the tongue, with fingers and with the thingy, but it didn't penetrate. She also said in there's another area noted in her vaginal area that [J.S.] would get on top of her and try to put his thingy in her. And then in terms of her feet, she said she had to grab his thingy with her feet."
 {¶ 48} M.S. also told Mrs. Cord that "she had shared with her mom one time, the first time anything had happened, that [Appellant] had been out of his boxer shorts. And [M.S.'s] understanding of mom's response to it, mom had just said that it was a one time thing and it was an accident and it wouldn't happen again and kind of brushed her off. * * * The second time [M.S.] disclosed was in the grocery store and that's about all she said."
 {¶ 49} Mrs. Cord further testified that M.S. discussed how Appellant made her "ride the horsey[,]" which M.S. described as "riding on top of [Appellant] till he ejaculated even though * * * he could not completely penetrate her[,]" and "play dirty game[s]." M.S. talked about how Appellant "would trick them into playing games and that one of the games that they had was kind of like a game of war, but whenever you lost one of the — whenever you lost the war, you had to remove an article of clothing." M.S. also discussed how Appellant made her and her brother play "doctor."
 {¶ 50} Mrs. Cord discussed on cross-examination that her records indicated that M.S. had a long term history of psychiatric problems and that she had been seeing a psychiatrist at the Child Guidance Center since she was five years old. Mrs. Cord further explained that aside from sexual abuse, M.S. could have been suffering from post-traumatic stress disorder because she had stopped seeing her father, her mother was extremely ill, and she essentially had an unstable home environment. Additionally, Mrs. Cord stated that the diagnostic assessment report, which was completed by a psychologist at the Child Guidance Center when M.S. was ten years old, specifically stated that M.S. had hallucinations and that one of her "presenting problems" was that she "lies." Mrs. Cord stated that when she was with M.S. the child never hallucinated.
 {¶ 51} In addition to the counselors, the State called two members of the Barberton Police Department, Detectives Gerrard Antenucci and Shannon Davis, to testify. Detective Antenucci testified that he was involved in the investigation concerning Appellant. He arrested Appellant at the Shamrock Motel. Detective Antenucci stated that after Appellant was arrested he photographed certain items in Appellant's motel room, namely a "drug smoking pipe," a business card from a sexual novelty store called "NuTones," a computer and the screen displayed on the computer was a sexual website called "LolitaNu.com," a dresser drawer containing women's pantyhose and some "sex toys" or "dildos," pornographic magazines and videotapes. The detective provided the jury with some of the titles to the magazines confiscated from the motel room at Shamrock Motel. Some of the titles included: "Pussy Lickers"; "Hungry Cunts"; "Banging Butts"; "Young Tight Co-Eds"; "Hardcore"; "Cherry Poppers"; and "Barely Legal." The detective admitted on cross-examination that the magazines did not appear to be illegal.
 {¶ 52} Detective Shannon Davis took the initial report when Mrs. Rivera arrived at the police station to report Appellant's abuse of her children. Detective Davis testified that after she interviewed the victims and their mother, she later confiscated the computer owned by the mother and two dresses that belonged to M.S. The detective stated that she arrested Appellant at the Shamrock Motel. Once Appellant was booked and Mirandized, Detective Davis conducted an interview with Appellant. During the interview, Appellant told the detective that "the kids didn't like him and that he and [Mrs. Rivera] had had problems." Appellant told the detective that the children were lying because he did not have sexual relations with them. Appellant also told the detective that he never touched the children, never showed them any videos or magazines and that he only saw J.S. naked when the boy needed help washing soap out of his hair.
 {¶ 53} During the detective's second interview with Appellant, Appellant admitted that he liked to put nylons on his penis and that he used the nylons to masturbate. Appellant explained that it was a "fetish" and that M.S. had never seen him do it, unless she had, unbeknownst to him, walked in on him. Detective Davis further testified that Appellant told her that he would wrestle with M.S. and that on one particular occasion his penis fell out of his boxers. Appellant said that M.S. and J.S. never performed oral sex on him or touched his penis.
 {¶ 54} Detective Davis stated on cross-examination that the dresses taken from M.S. were sent to the Bureau of Criminal Investigation to test for semen stains; the tests were negative. The detective stated that when she took the initial statement from the victims' mother, the mother stated that M.S. told her that Appellant never tried to place his penis in her vagina. The detective further admitted on cross that there was no scientific evidence to substantiate the children's allegations. Detective Davis also agreed that Appellant readily admitted "he told [the detective] that he looked at dirty movies; he told [the detective that] he had dirty magazines; he told [the detective] that he looked at porn on the Internet. He told [the detective that] he gave [J.S.] a bath and saw him naked, but he denied any type of sexual action with either of those children[.]"
 {¶ 55} The testimony presented by the State's witnesses showed that the victims, ages nine and ten at the time the offenses were committed against them, remained relatively consistent with their allegations of abuse from December 2001 to June 2003, the day they were required to testify at trial. In December 2001, the children told Mrs. Abbott and Mrs. Morstatter that Appellant forced M.S. to have sex with him and her brother; Appellant forced M.S. to perform fellatio; Appellant placed a vibrator in M.S.'s vagina; Appellant made the children play "ride horsey," "doctor" and "strip poker"; Appellant liked to put nylons on his penis; and Appellant showed the children pornographic pictures in magazines and on his computer. From January 2002 to June 2002, the children told essentially the same stories to Mrs. Baker, J.S.'s counselor, and Mrs. Nord, M.S.'s counselor. Almost a year and a half after the children initially told their story in December 2001, they were able to take the stand and tell the same stories, with very little variation, in June 2003.
 {¶ 56} "The jury is the sole judge of the weight of the evidence and the credibility of witnesses." State v. Antill
(1964), 176 Ohio St. 61, 67; see, also, State v. Walker (1978),55 Ohio St.2d 208, 212, certiorari denied (1979), 441 U.S. 924,99 S.Ct. 2033, 60 L.Ed.2d 397. The jury is in the best position to view the witnesses' testimony and adjudge their credibility. This Court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless we conclude that the factfinder clearly lost its way. State v. Urbaytis
(1951), 156 Ohio St. 271, 278. In this case, it appears that the jury found the children credible witnesses despite testimony that they suffered from certain behavioral problems and were prone to lying. Therefore, based on the evidence presented at trial, this Court finds that the evidence does not weigh heavily against the judgment and the trial court did not create "such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Otten, 33 Ohio App.3d at 340. Appellant's first assignment of error is not well taken.
 Assignment of Error Number Two
"The trial court erred in denying appellant's motion for [a] mistrial."
 {¶ 57} In Appellant's second assignment of error, he has argued that the trial court erred when it denied his motion for a mistrial. This Court disagrees.
 {¶ 58} An appellate court's review of the denial of a motion for a mistrial is an abuse of discretion. State v. Sage (1987),31 Ohio St.3d 173, 182. An abuse of discretion connotes more than a mere error in judgment; it signifies an attitude on part of the trial court that is unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Berk v.Matthews (1990), 53 Ohio St.3d 161, 169.
 {¶ 59} In the instant matter, Appellant moved, several times, for a mistrial. The motions for mistrial were based on the testimony elicited from Elizabeth Morstatter, an employee at Akron Children's Hospital who interviewed J.S. and M.S regarding their claims of sexual abuse. The following discussion took place between the State and Mrs. Morstatter when the State asked Mrs. Morstatter about M.S.'s cognitive abilities:
"[The State:] Can you describe [M.S.'s] appearance and her general attitude on the day you interviewed her?
"[Mrs. Morstatter:] She seemed friendly and interactive. She came into the room with a Barbie Doll, she warmed up to the interview quickly.
"[The State:] Did you do any exercises to test her ability to comprehend.
"[Mrs. Morstatter:] We talked about school, what her school life is like. She counted for me. She differentiated between in, on, under, beside, those kinds of things.
"[The State:] And why did you do these exercises?
"[Mrs. Morstatter:] To see if those were concepts that she was, say, aware of.
"[The State:] Did you ask her if she knows the difference between telling the truth and telling a lie?
"[Mrs. Morstatter:] That's part of my routine is to cover that.
"[The State:] And how did she respond to that?
"[Mrs. Morstatter:] I believe she was being honest with me."
 {¶ 60} Immediately after Mrs. Morstatter indicated that she believed M.S. was "honest," defense counsel objected. Based on that testimony, defense counsel moved for a mistrial, stating: "It is our feeling that it is totally improper for an expert witness to make any kind of comments as far as the veracity of another witness or, in this case an alleged child victim." Relying on State v. Hackney (Aug. 30, 1993), 12th Dist. No. CA92-12-118, 1993 Ohio App. LEXIS 4200, appeal not allowed (1997), 78 Ohio St.3d 1488, the State argued that the motion should be denied and instead a curative jury instruction should be given. The trial court denied Appellant's motion for a mistrial, stating:
"The factors in the [c]ourt deciding [to deny the motion for a mistrial] is, number one, the proceeding was stopped immediately so that there is an opportunity for a curative instruction.
"Maybe more importantly in the [c]ourt's mind was the question and where the state of the questioning was of this witness.
"I don't have it verbatim but the question — the line of questioning to the witness pertained to did the witness discuss with the alleged victim the difference between telling the truth and a lie.
"The witness answered — Mrs. Morstatter answered yes, I did that as a part of my normal protocol.
"There was a follow-up question as it relates to the whole conversation on the issue of truth versus falsity.
"It was at that point that, unresponsive to the question, the witness indicated something to the effect of I believe that — I don't know how she phrased it. I believe the victim was being honest.
"The [c]ourt, based on the nature of the questioning to that point, based on where the questioning was, the [c]ourt at this time is not going to grant a mistrial.
"The [c]ourt believes that a curative instruction and a clarification can be made at this point."
 {¶ 61} In accordance with the defense's request for curative instruction, the trial court instructed the jury:
"Also, before I proceed, at the conclusion of our case yesterday you may or may not have heard that the witness that was on the stand made a statement as it relates to the credibility of the child that she was interviewing.
"I need to give you an instruction as it relates to that.
"You will disregard the testimony of the opinion of any witness, this witness in particular, as to the credibility of any testimony or any statement which she heard.
"The jury will disregard the opinion of this witness as to credibility."
 {¶ 62} The Ohio Supreme Court has previously addressed the issue of whether an expert witness may testify as to the veracity of a child witness. In State v. Boston (1989),46 Ohio St.3d 108, syllabus, the court held that "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." (Alterations added.) In that case, a two and a half year old child was allegedly sexually abused by her father; the parents of the child were involved in a "bitter battle for custody." Id. at 108. The child was found to be incompetent to testify as a witness, and the trial court admitted into evidence statements the child made to her mother, the treating pediatrician, and her counselor. The pediatrician testified that the victim "had not fantasized her abuse and that [the victim] had not been programmed to make accusations against her father. With this testimony, [the doctor], in effect, declared that [the victim] was truthful in her statements." Id. at 128. The counselor, a specialist in child sexual abuse, testified at trial that the victim was telling the truth.
 {¶ 63} After examining the Rules of Evidence, specifically Evid.R. 702, 703, 704, and 705, 803(4), the Ohio Supreme Court held that "[w]e have little difficulty in finding that the admission of this testimony was not only improper — it was egregious, prejudicial and constitutes reversible error." Id. at 128. Quoting State v. Eastham (1988), 39 Ohio St.3d 307, theBoston court further explained that "`[i]n our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.'" (Alterations added.) Boston,46 Ohio St.3d at 129. As a result of the evidential error, which the court found to be more than harmless error, the Ohio Supreme Court reversed and remanded the matter for a new trial. Id. at 129.
 {¶ 64} Based upon our understanding of Boston and its progeny, we find that Mrs. Morstatter's testimony concerning the victim's veracity was improper. "However, this [C]ourt has recognized that error in admitting such expert testimony may be harmless beyond a reasonable doubt. This conclusion is warranted if the victim testifies and is subject to cross examination, the state introduces substantial medical evidence of sexual abuse, and the expert's testimony is cumulative to other evidence." (Alterations added.) State v. Kincaid (Oct. 18, 1995), 9th Dist. Nos. 94CA005942 and 92CA005945, at 6; see, also, State v.Palmer (Feb. 8, 1995), 9th Dist. No. 2323-M, at 19. We further explained in Kincaid that "a finding of harmless error is not justified if the case is a `credibility contest.'" Kincaid,
supra, at 6.
 {¶ 65} As pointed out by Appellant, this case is essentially a "credibility contest." There is no physical evidence of sexual abuse. The most convincing evidence of abuse was presented by the victims, M.S. and J.S., and the counselors that interviewed the children after the incidents occurred. There is no need, however, for this Court to apply Kincaid or Palmer. This case is easily distinguishable from our prior cases. Here, the victims were ages nine and ten when the sexual abuse occurred. In contrast, the victim in Kincaid was six years old and the victims in Palmer were seven and four years old. Because the victims in Kincaid and Palmer were far younger than the victims in the present case, "[i]t is understandable that the court required substantial medical evidence of the sexual abuse[.]" State v. Miller (Jan. 26, 2001), 2nd App. Dist. No. 18102, 2001 Ohio App. LEXIS 230, at *17, appeal not allowed (2001), 91 Ohio St.3d 1529 (declining to apply the holdings inKincaid and Palmer on the ground that the victim was a teenager). M.S. and J.S. testified that Appellant made them play sexual games, such as "ride horsey" and "strip poker," which would not necessarily leave behind physical signs of sexual abuse. Further, M.S. testified that Appellant attempted to penetrate her with his penis, but he was unsuccessful. An unsuccessful attempt to perform vaginal sex on a nine year old child may also fail to leave behind signs of sexual abuse.
 {¶ 66} Despite the absence of any physical evidence indicating that M.S. and J.S. were sexually abused by Appellant, the record is replete with testimony from the children's counselors proving that the children were indeed sexually abused. The testimony of Mrs. Morstatter, Mrs. Baker, and Mrs. Abbott and Mrs. Nord collectively showed that the children were consistent in their stories of sexual abuse and that the children were suffering the mental effects from sexual abuse. Furthermore, the victims were subject to cross-examination. As the evidence presented at trial overwhelmingly shows that the children were sexually abused by Appellant, this Court finds that Mrs. Morstatter's testimony was harmless beyond a reasonable doubt. Consequently, this Court must necessarily find that the trial court did not abuse its discretion when it denied Appellant's motion for a mistrial on such grounds. Appellant's second assignment of error is without merit.
 Assignment of Error Number Three
"The trial court erred in sentencing appellant to life terms without setting a minimum term pursuant to r.c. 2970.03 [sic]."
 {¶ 67} In Appellant's third assignment of error, he has argued that the trial court erred when it sentenced him to life terms without setting a minimum term pursuant to R.C.2971.03.[1] This Court disagrees.
 {¶ 68} In reviewing sentencing decisions, the Ohio Supreme Court has held that "an appellate court will not review a trial court's exercise of discretion in sentencing when the sentence is authorized by statute and is within the statutory limits." Statev. Hill (1994), 70 Ohio St.3d 25, 29. Thus, this Court will not disturb the trial court's sentencing decision unless we find that the trial court abused its discretion when it imposed sentence upon Appellant. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Adams
(1980), 62 Ohio St.2d 151, 157.
 {¶ 69} In the instant matter, Appellant was sentenced for, among other offenses, rape, a violation of 2907.02(A)(1)(b). A violation of R.C. 2907.02(A)(1)(b) is a felony of the first degree and "[i]f the offender under [R.C. 2907.02(A)(1)(b)] purposely compels the victim to submit by force or threat of force or if the victim under [R.C. 2907.02(A)(1)(b)] is less than ten years of age, whoever violates [R.C. 2907.02(A)(1)(b)] shall be imprisoned for life."
(Alterations added.) R.C. 2907.02(B). Appellant has also assumed on appeal that the trial court also relied upon R.C.2971.03(A)(3) when it sentenced Appellant. That statute provides that a trial court must sentence a defendant that has pleaded guilty to a sexually violent offense and a sexually violent predator specification to "an indefinite prison term consisting of a minimum term fixed by the court from among the range of terms available as a definite term for the offense, but not less than two years, and a maximum term of life imprisonment." R.C.2971.03(A)(3). Based on his belief that the trial court sentenced him to two counts of rape pursuant to R.C. 2907.02(B) and R.C.2971.03(A)(3), Appellant has maintained that he "is nonetheless entitled to have a minimum term set, which ultimately allows for the possibility of parole[.]"
 {¶ 70} This Court first notes that Appellant failed to file a transcript of the sentencing hearing. The record indicates that only transcripts of the jury trial were filed with this Court. We further note that the journal entry of sentencing does not indicate that the trial Court sentenced Appellant pursuant to R.C. 2971.03. Because the journal entry of sentencing does not reflect that the trial court applied R.C. 2971.03 and we are without a transcript of the sentencing hearing this Court is not certain whether the trial court actually applied R.C. 2971.03
when it sentenced Appellant on each rape count.
 {¶ 71} The question of whether the trial court applied R.C.2971.03 to Appellant is further compounded by the fact that the statute does not appear to apply to him for several reasons. First, the statute only applies to those persons convicted of a sexually oriented offense and a sexual predator specification. Although Appellant was convicted of a sexually oriented offense, he was not also convicted of a sexual predator specification. Second, the statute does not apply to persons who were convicted of aggravated murder, murder, or crimes for which the term of life imprisonment can be imposed. See R.C. 2971.03(A)(3). As previously stated, Appellant was convicted of two counts of rape, in violation of R.C. 2907.02(A)(1)(b), and sentenced to life imprisonment pursuant to R.C. 2907.02(B). Therefore, R.C.2971.03(A)(3) does not apply to Appellant.
 {¶ 72} Because R.C. 2971.03 does not apply to Appellant and it is not clear from the record that the trial court actually applied R.C. 2971.03 when it sentenced Appellant, we find that the trial court did not abuse its discretion when it sentenced Appellant on two counts of rape. Appellant's third assignment of error is not well taken.
 III {¶ 73} Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
Carr, P.J., Batchelder, J., Concur.
[1] This Court notes that throughout his appellate brief, Appellant repeatedly cited to R.C. 2970.03. As that statute does not exist, this Court assumes that Appellant intended to argue that R.C. 2971.03 is applicable to the instant matter.