DECISION AND JOURNAL ENTRY
{¶ 1} Defendant, Manuel Arias, appeals from the decision of the Lorain County Court of Common Pleas which found him guilty of two counts of rape, three counts of gross sexual imposition, three counts of kidnapping, and one count of sexual battery, and adjudicated Appellant a sexually violent predator. We affirm.
 {¶ 2} On February 11, 2003, Appellant was charged with: one count of rape, in violation of R.C. 2907.02(A)(2), with a sexually violent predator specification; three counts of kidnapping, in violation of R.C. 2905.01(A)(2), all with a violent predator specification; and four counts of gross sexual imposition, in violation of R.C. 2907.05(A)(1). A supplemental indictment was filed a day later, charging Appellant with: one additional count of rape, in violation of R.C. 2907.02(A)(2), with a violent predator specification; and one count of sexual battery, in violation of R.C. 2907.03(A)(1), with a violent predator specification.
 {¶ 3} The State dismissed one count of gross sexual imposition, whereupon the remaining counts went to trial. The jury found Defendant guilty of all nine remaining counts: three counts of gross sexual imposition, three counts of kidnapping, two counts of rape, and one count of sexual battery. Defendant waived his right to have the jury determine the six sexually violent predator specifications, and the court found him guilty of all six of those specifications. The court also sentenced Defendant to an aggregate sentence of thirty years to life in prison and found Defendant to be a sexually violent predator. Defendant timely appealed, raising five assignments of error for our review.
 ASSIGNMENT OF ERROR I
"The trial court erred when it denied [Defendant's] motion for judgment of acquittal pursuant to [Crim.R. 29] as to counts one (1) and nine (9) of the indictment."
 ASSIGNMENT OF ERROR II
"[Defendant's] conviction on counts one (1) and nine (9) of the indictment is against the manifest weight of the evidence."
 ASSIGNMENT OF ERROR III
"[Defendant's] conviction for kidnapping on counts three (3), seven (7) and eight (8) of the indictment was against the manifest weight of the evidence."
 {¶ 4} In Appellant's first and second assignments of error, he alleges that his rape convictions on counts one and nine were both supported by insufficient evidence and against the manifest weight of the evidence. Defendant states that testimonial evidence alone, without accompanying corroboration of physical evidence, is not enough to support a rape conviction. Defendant also challenges whether there was any evidence showing that he used any force or threat of force in those cases. Rather, he insists his victims were free to leave at any time.
 {¶ 5} In his third assignment of error, Defendant contends that his kidnapping convictions on counts three, seven, and eight were against the manifest weight of the evidence. Defendant again asserts that the State offered no evidence that he used any force, or threat of force, to restrain any of the alleged victims' liberty. Rather, he again opines that the women were free to leave at any time. We find Appellant's contentions to be without merit.
 {¶ 6} Sufficiency of the evidence produced by the State and weight of the evidence adduced at trial are legally distinct issues. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. As to sufficiency, Crim.R. 29(A) states that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." However, if the record demonstrates that reasonable minds may reach differing conclusions as to the proof of material elements of a crime, a trial court may not grant a Crim.R. 29(A) motion for acquittal. State v. Smith, 9th Dist. No. 20885, 2002-Ohio-3034, at ¶ 7, citing State v. Wolfe (1988),51 Ohio App.3d 215, 216. "`In essence, sufficiency is a test of adequacy.'" Smith at ¶ 7, quoting Thompkins,78 Ohio St.3d at 386.
 {¶ 7} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v.Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citingThompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant maintains that his conviction is against the manifest weight of the evidence:
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This power is to be invoked only in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id.
A. Relevant Statutes
 {¶ 8} R.C. 2907.02(A)(2), defining rape, prohibits any person from "engage[ing] in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Sexual conduct includes "the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another." R.C.2907.01(A).
 {¶ 9} Defendant was also charged with three counts of kidnapping in violation of R.C. 2905.01(A)(4):
"No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity * * * with the victim against the victim's will[.]"
R.C. 2907.01(C) defines sexual activity as including both sexual conduct, defined above, and sexual contact, which is "any touching of an erogenous zone of another * * * for the purpose of sexually arousing or gratifying either person." See R.C.2907.01(B).
B. Count Nine: Rape of Briekethia Pruitt
 {¶ 10} In count nine, Defendant was convicted of the rape of Briekethia Pruitt ("Pruitt"). Pruitt testified that she met Defendant through the Urban Minority Alcoholism Drug Abuse OutReach Program ("UMADAOP"). After getting out of a detention facility for attempting to stab her step-father, Pruitt's parole officer referred her to UMADAOP in June 2002. At that time, Defendant volunteered with UMADAOP, and helped every Tuesday with the group program which Pruitt attended. Although Defendant told Pruitt that he had strangled a woman to death, and suffocated another person while in prison, Pruitt initially found Defendant to be very personable.
 {¶ 11} Pruitt testified about three separate incidents involving Defendant. The final incident with Defendant, the one which led to his rape conviction, occurred in December 2002. Pruitt was babysitting at a friend's home. Defendant called her at the home, telling her to open the door. Pruitt did, thinking that it was actually her boyfriend, and not Defendant, calling. Defendant entered the house where she was babysitting, and started talking to her on the couch. Defendant then pushed her back on the couch, pulled off her pajama shorts, and began to perform oral sex on her. She tried to shut her legs, or push him away, but could not. Defendant also placed two fingers into her vagina. About that time, the two babies upstairs began to cry, and Defendant let Pruitt go upstairs to calm them. When she came back downstairs, he left, telling her that he would be back.
 {¶ 12} Pruitt explained that, while she tried to stop Defendant, she was too afraid to struggle too much. "He done killed people. What makes you think I couldn't have been next?" Pruitt was also afraid for the lives of her family, as Defendant had indicated to her that he was a hit man. After Pruitt returned to a detention facility at the end of December 2002, she filed a written complaint with UMADAOP. She also sent a letter to her boyfriend with instructions for a friend: "Tell Josie that I said some people going to come talk to her about * * * [what] happened with [Defendant]. Tell her that I said all she has to do is say that she met him that day that he came over there, and what kind of car the he drive and that he gave me head." Pruitt explained that her instructions did not tell Josie to lie, but rather were meant to let her know it was alright to talk to the police about the incident.
 {¶ 13} The police, however, were not alerted to Pruitt's allegations until nearly a month after Pruitt filed her complaint. The supervisor at UMADAOP only forwarded the letter to the police after further accusations against Defendant surfaced from the Haven Center ("Haven"). That supervisor subsequently lost her job with UMADAOP for not responding immediately to Pruitt's complaint.
C. Counts Seven and Eight: Kidnapping of Colleen Churchill
 {¶ 14} Colleen Churchill ("Churchill") was a resident at Haven, a homeless shelter, during January 2003. She had previously stayed at Haven a few times, and returned because she was homeless, jobless, and disabled. Regardless of the fact that Defendant's business card stated otherwise, Churchill believed that Defendant was a drug and alcohol counselor at the shelter because he introduced himself as such. She also stated that Defendant had a lot of power at Haven. "I thought he was top dog. * * * [I]n a way it seemed like he was even higher up than [Lisa Navarro,] the lady that ran place." Churchill actually met Defendant through a mutual friend prior to her return to Haven. She trusted Defendant, and went to Haven to speak with Defendant about some personal issues on January 8, 2003. Churchill testified that Defendant was very helpful at that meeting, and, at Churchill's request, immediately got her back into Haven.
 {¶ 15} After returning to Haven, Defendant would occasionally call Churchill into the small, secluded back office of manager Lisa Navarro ("Navarro") to talk. One afternoon, sometime around January 12, 2003, Defendant called her into the office to talk. However, he talked to her so long that she missed the bus which would take her to the local mall where she consistently met her boyfriend. After telling Defendant her problem, Defendant offered to give her a ride to the mall. She agreed.
 {¶ 16} Defendant, however, drove straight past the mall. Churchill recalled that she told Defendant he had passed the mall, and that she could not remember if he responded to her statement. Instead, he started "touching his penis over his pants[.]" Defendant then began to pull Churchill's hand over to put her hand on his penis, and, after a few seconds, she pulled her hand away. Defendant tried to pull her hand over to him again, and she, again, pulled it away. At that point, Churchill testified that Defendant actually pulled his penis out of his pants and continued to manipulate it. He tried, again, to pull her hand over to touch him, whereupon she continued to pry her hand away. Defendant than "came really fast and wiped his hand across [Churchill's] face." Churchill swore at Defendant, and then wiped her face with her hand, and wiped her hand off on the ankle of her sock. Throughout the incident, Churchill wanted to get out of the car, but she could not because Defendant was driving too quickly. She was afraid that she would be run over if she jumped out of the car. Following the incident, Defendant returned to the mall and dropped off Churchill, telling her to "remember where [he] work[ed]."
 {¶ 17} Churchill did not tell anyone about what Defendant had done to her. She did not think that anyone at Haven would believe her. "I was a homeless person, first of all. [Defendant] was very well-respected." She was also afraid that Defendant would have her thrown out of the homeless shelter, and she had no where else to stay during the cold winter.
 {¶ 18} Churchill continued to stay at Haven, and would often see Defendant at the center. Two or three days following the incident in the car, Defendant called Churchill into Navarro's back office. She followed him because she felt that if she did not, she would be thrown out of Haven. After she entered the office, Defendant closed the door behind him. He started discussing her boyfriend with her, and told her that he knew about their problems. He then brushed the hair out of Churchill's eyes, tried to kiss her, and touched her buttocks. Churchill tried to get away, but Defendant, a rather large man, was standing between her and the door. Eventually, she did push Defendant out of the way, and left the room.
 {¶ 19} Following this second incident, Defendant again called her into the back office. Defendant, again, closed and locked the door. He tried to kiss her again, and the same struggle for the door ensued. On this second occasion, after she opened the door and began to leave, she recalled that Defendant "kind of freaked out[,] [and said] `What are you doing? You know I work here. You know who I am.'" Again, Churchill told no one of Defendant's behavior. "I wasn't ever going to tell anybody." She was too embarrassed to tell anyone, too afraid no one would believe her, and too worried about getting thrown out of Haven during the winter.
 {¶ 20} However, when Churchill's roommate at Haven, Stacie Tramble ("Tramble"), suddenly changed from praising Defendant, to acting afraid of Defendant, she decided to tell someone. "[Tramble's] attitude changed overnight drastically and she was no longer — when she talked about [Defendant], she no longer sounded like she trusted him. She sounded like she was more worried about him. She seemed to kind of avoid him." Churchill then confided in Tramble, and Tramble explained what Defendant had done to her.
D. Counts One and Nine: Rape and Kidnapping of Stacie Tramble
 {¶ 21} Tramble testified at trial that she was a resident at Haven during January 2003. She met Defendant at Haven on a Wednesday, and thought he worked at the shelter. In fact, Tramble, like Churchill, believed that Defendant was the man in charge of the shelter. Defendant had indicated that "he's the one that get people in and out of [Haven]." Defendant also told Tramble that he had just been released from prison for murder, and was a member of a motorcycle gang.
 {¶ 22} Tramble recalled two separate incidents regarding Defendant, both of which occurred in Navarro's small, secluded back office. On both occasions, Defendant called Tramble into the back office to talk to her. The first time, Defendant called her into the office, he shut the door behind her. He told her that he thought she was pretty, and explained that he was upset about how an employee of Haven was "hitting on him all the time" even though the employee was married. From there, Tramble explained, "[t]he conversation just went sour." Defendant just started to kiss her, grabbing at her throat. Tramble tried to push him away, but did not make him stop because "he told [her that she] could get kicked out [of Haven], and he would get [her] kicked out with no extension[.]" She was also afraid that Defendant would hurt her if she fought back. Regardless of her continued pleas asking him why he was doing this, he continued, telling her to be quiet and putting handcuffs on her.
 {¶ 23} On this first occasion, another man, Sly Worthy ("Sly"), actually knocked on the door, and entered the office to get a lighter. Tramble indicated that Sly could not see that she was handcuffed due to the position she was sitting in. Tramble testified that she did not try to alert Sly to her predicament because Sly was Defendant's friend, and she did not think he would help her. After Sly retrieved a lighter and left the office, Defendant started kissing her again. He touched her breasts through her shirt, and also touched her between the legs over her jeans. Defendant finally removed the handcuffs from Tramble, and released her.
 {¶ 24} On the second occasion, Tramble stated that Defendant called her back to the office again. She followed him into the office because she needed a shelter letter which she thought he would provide for her. She also indicated that she did not think Defendant would try to touch her again, though she did not explain why. Defendant told her that he was upset about some messages which were left on his phone, and accused her of leaving them, though she denied that. Defendant also told her that if she told anyone about what he had done to her previously, that she "wasn't going to make it to Cleveland [where her mother was] or go back home." Defendant then grabbed her by the throat, and began "sucking at [her] breasts, fondling [her] breasts, * * * pinching, * * * kissing [her], * * * slobbering on [her] face, [and] * * * [putting his] fingers inside [her] vagina." Tramble stated that Defendant reached inside her jogging pants, and placed his fingers inside her, causing her pain. Tramble, however, felt helpless to stop Defendant: "He killed somebody else. What made me different from somebody else?"
 {¶ 25} Tramble did not feel comfortable telling anyone else about her experiences with Defendant. Not only would the staff at Haven be unlikely to believe Tramble due to the respect they had for Defendant, Tramble believed that Defendant would harm her or her family if she told anyone. She was also concerned about being thrown out of Haven during the winter. Only when Churchill, her roommate, told Tramble of her similar experience did Tramble finally tell someone. Tramble came forward only after Churchill told the staff at Haven about both Churchill's and Tramble's experiences with Defendant.
E. Defendant's Response to the Allegations
 {¶ 26} Defendant denied the allegations of Pruitt, Churchill, and Tramble. Defendant admitted that he knew of Pruitt through his job with UMADAOP, but insisted that he only knew her from a group setting and did not interact with her at all on a one-on-one basis. He denied giving her his cell phone number, though she readily recalled the number from memory at trial. He also denied ever seeing Pruitt anywhere except at UMADAOP. He did indicate, however, that he told the juveniles in UMADAOP about his previous murder conviction.
 {¶ 27} As to Churchill, Defendant originally told the police that he thought he might know her, regardless of the fact he had spoken with Churchill only an hour or so prior to his voluntary interview with the police. Defendant testified that Churchill had asked him for a ride to the mall because she wanted to stop on the way to pick up and cash a check. As Churchill did not have a bank account, she needed someone else to help her cash the check. When they returned to his vehicle to drive to the mall, Defendant denied that he forced Churchill to touch him. Rather, Defendant indicated that Churchill "grabbed [him] * * * and started masturbating. * * * [He] push[ed] her hand away." "She told [him], why you pushing you hand back? And [he] told her * * * well we shouldn't. * * * And she kept doing it, you know. * * * And [he] let it be for a minute. Then [he] thought about it, before [he] ejaculated [he] pushed her hand * * * [He] ejaculated in [his] hand, and she got mad." Defendant stated that Churchill tried to lick off Defendant's hand, but he told her to stop. She then told him to clean his hand off on her sock, and put her foot across the center console so he could do so.
 {¶ 28} Churchill's sock was entered into evidence at trial, and a forensic scientist found seminal fluid on the sock which matched Defendant's. When asked by the police whether they would find anything on the sock, Defendant admitted that he lied to the police, telling them they would not. Defendant testified that he lied to them because he thought the investigation would eventually show that all three women were lying. He also stated that he lied in order to protect Churchill — Defendant's statement indicated that she had sexually assaulted him, and Defendant was afraid that Churchill's boyfriend would hurt her if he found out.
 {¶ 29} Defendant also denied Churchill's statements regarding further incidents which occurred at Haven. In addition, he denied all of Tramble's allegations. He was certain that, while the back office was isolated, no one could go unnoticed in that office. He insisted that the area near the office was always busy with people, and that, regardless of the large refrigerators near the office door, you could hear people conversing through the door. He did take Tramble into the back office on occasion to talk to her about various problems with her attitude, but he was certain he had never closed the door. He also recalled that one time, when he and Tramble were talking in that office, Sly came in to get a lighter. Defendant, however, denied that anything beyond talking happened between him and Tramble.
 {¶ 30} Defendant also denied ever having possession of any handcuffs. He had noticed them in the front office, but did not have keys to them — or even know if they needed keys. The handcuffs, in fact, did not need keys, though Defendant was the only one at trial who seemed to recognize this fact. A Haven employee actually testified that Defendant had once showed her the handcuffs and asked her to put them on. She refused. A second Haven employee testified that the handcuffs were always in the back office, and never in the front office where Defendant stated they were.
 {¶ 31} When asked about the timing of the women's allegations, and the fact that Pruitt, at least, knew nothing of the other two women's statements, Defendant simply stated that they were all lying.
F. Conclusions
 {¶ 32} We first note that, contrary to Defendant's assertions, a rape victim's testimony need not be corroborated by physical evidence in order to sustain a conviction. State v.Battle (Aug. 11, 1993), 9th Dist. No. 15869, at 10, citingState v. Gingell (1982), 7 Ohio App.3d 364, 365. The testimony of Pruitt and Tramble alone, if believed by the trier of fact, is enough. See id. Also, force under R.C. 2907.02(A)(1) need not be physical and brutal. State v. Eskridge (1988),38 Ohio St.3d 56, 58-59. Force may also be established by testimony that the victim's will was overcome by fear. Id. Pruitt and Tramble's testimony regarding their fear of retaliation by Defendant, if they did not engage in sexual conduct with him, is enough to establish force if believed by the trier of fact. See id.
 {¶ 33} Overall, we find that none of the challenged convictions are against the manifest weight of the evidence. A jury could have found that Defendant raped Pruitt at her home; kidnapped Churchill in his vehicle to engage in sexual activity; kidnapped Churchill by preventing her from leaving the back office to engage in sexual activity; kidnapped Tramble by restraining her in the back office to engage in sexual activity; and raped Tramble in that same back office. While Defendant presented conflicting evidence on each count, we will not find that a conviction is against the manifest weight of the evidence simply because the jury chooses to believe the evidence offered by the prosecution. State v. Moore, 9th Dist. No. 03CA0019, 2003-Ohio-6817, at ¶ 18, citing State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. A finding that a conviction is supported by the weight of the evidence, also includes a finding of sufficiency of the evidence. State v.Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. Accordingly, we overrule Defendant's first, second, and third assignments of error.
 ASSIGNMENT OF ERROR IV
"[Defendant] was denied the effective assistance of counsel due to counsel's failure to present an affirmative defense that the kidnapping victims were released to a safe place and due to counsel's failure to request a jury instruction as to the affirmative defense thereby depriving [Defendant] of any chance of avoiding a conviction on three felonies of the first degree on counts three (3), seven (7) and eight (8) of the indictment."
 {¶ 34} In his fourth assignment of error, Defendant alleges that he was denied the effective assistance of counsel. Specifically, Defendant states that defense counsel should have presented an affirmative defense to the kidnapping charges and requested a correlating jury instruction for that defense. We find Defendant's assertions meritless.
 {¶ 35} In evaluating an ineffective assistance of counsel claim, this court employs a two step process as described inStrickland v. Washington (1984), 466 U.S. 668, 687,80 L.Ed.2d 674. First, the court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client." State v. Bradley (1989),42 Ohio St.3d 136, 141; State v. Lytle (1976), 48 Ohio St.2d 391, 396. Licensed attorneys are presumed competent in Ohio. Lytle,48 Ohio St.2d at 397. Defendant must overcome the "presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, quoting Michel v. Louisiana (1955), 350 U.S. 91, 101,100 L.Ed. 83. Due to the wide variety of available methods in which defense counsel may provide effective assistance, employment of a debatable trial strategy does not by itself constitute ineffective assistance of counsel. In re J.J., 9th Dist No. 21386, 2004-Ohio-1429, at ¶ 15.
 {¶ 36} Second, the court must determine if prejudice resulted to Defendant from counsel's ineffectiveness. Bradley,42 Ohio St.3d at 141-42. Prejudice exists where the trial result would have been different but for the alleged deficiencies of counsel. Id. at paragraph three of the syllabus. Defendant bears the burden of proof, and must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 48-49, quoting Strickland,466 U.S. at 687.
 {¶ 37} Kidnapping under R.C. 2905.01(C) is a felony of the first degree. However, "[i]f the offender releases the victim in a safe place unharmed, kidnapping is a felony of the second degree." R.C. 2905.01(C). In this case, Defendant alleges that trial counsel was ineffective for failing to present evidence and argue that Defendant released his kidnapping victims in a safe place unharmed.
 {¶ 38} Defendant's defense at trial to the three kidnapping charges was based upon his outright denial of the facts in all three. As to Churchill, he denied holding her in the car against her will, and denied ever meeting with her in the back office. As to Tramble, Defendant denied the she was ever unable to leave the office of her own free will. Two problems ensue in this case with requesting and presenting evidence on the statutory defense. First, the evidence in no way supported the defense. Either Defendant did not restrain the women's liberty in any way, or he restrained their liberty in order to engage in sexual activity. No evidence shows that he released them in a safe place, unharmed — it is difficult indeed to imagine that one may engage in sexual activity with another against their will and still argue that such a person is left "unharmed." Second, in order for defense counsel to raise the statutory defense of release in a safe place unharmed, counsel would have needed to virtually admit that Defendant kidnapped his victims.
 {¶ 39} Although Defendant found defense counsel's failure to argue and request an instruction on the statutory defense to kidnapping a debatable trial tactic, it, nonetheless, falls within the gamut of acceptable trial tactics, especially when Defendant has denied that the incidents even occurred and no evidence supported the defense. See State v. Hill (1995),73 Ohio St.3d 433, 443. Accordingly, we overrule Defendant's fourth assignment of error.
 ASSIGNMENT OF ERROR V
"The trial court erred in finding that there was sufficient evidence to adjudicate [Defendant] a sexual predator pursuant to [R.C.] 2950.01 and [R.C.] 2950.09."
 {¶ 40} In his fifth assignment of error, Defendant argues that the trial court erred by adjudicating him a sexual predator. Defendant's argument rests entirely on his assertion that both rape convictions were against the manifest weight of the evidence, and that his remaining convictions should render him a sexually oriented offender, and not a sexual predator. We disagree.
 {¶ 41} A sexual predator is a person who has been convicted of at least one sexually oriented offense and is likely to engage in future sexually oriented offenses. R.C. 2950.01(E)(1). An individual who has been convicted of a sexually violent offense and an accompanying sexually violent predator specification is automatically classified as a sexual predator, even without a hearing on the matter. R.C. 2950.09(A). In the case at bar, Defendant was convicted of two counts of rape, a sexually violent offense under R.C. 2971.01(G) and (L)(1), and the accompanying sexually violent predator specifications. Defendant has challenged both rape convictions based on the manifest weight and sufficiency of the evidence, but we have already found that the evidence in the case supported these convictions. As Defendant was properly convicted of two sexually violent offenses and their accompanying specifications, the trial court was required to automatically classify him as a sexual predator. See R.C.2950.09(A). Accordingly, we overrule Defendant's fifth assignment of error.
 {¶ 42} Defendant's assignments of error are overruled and the judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Whitmore, P.J., Batchelder, J., concur.