DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Jason E. Toth has appealed from the judgment of the Lorain County Court of Common Pleas that found him guilty of two counts of rape, one count of disseminating matter harmful to juveniles, and two counts of sexual battery. This Court affirms.
 I {¶ 2} On July 17, 2003, Defendant-Appellant Jason E. Toth was indicted on two counts of rape, in violation of R.C.2907.02(A)(2) and one count of disseminating matter harmful to juveniles, in violation of R.C. 2907.31(A)(1). Appellant was arraigned on July 23, 2003 and he waived reading of the indictment and entered "not guilty" pleas to all counts in the indictment. On January 14, 2004, a supplemental indictment was filed against Appellant charging him with two counts of sexual battery, in violation of R.C. 2907.03(A)(5). Appellant entered "not guilty" pleas to the charges in the supplemental indictment on January 21, 2004.
 {¶ 3} A bench trial commenced on September 9, 2004 and concluded on September 10, 2004. On September 15, 2004, the trial court found Appellant guilty of two counts of rape, one count of disseminating matter harmful to juveniles, and two counts of sexual battery. Appellant was subsequently sentenced to a total term of incarceration of seven years.
 {¶ 4} Appellant has appealed his convictions, asserting two assignments of error.
 II Assignment of Error Number One
"APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 Assignment of Error Number Two
"THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 OF THE OHIO RULES OF CRIMINAL PROCEDURE AS TO COUNTS, ONE, TWO AND THREE OF THE INDICTMENT."
 {¶ 5} In his first and second assignments of error, Appellant has argued that his convictions of rape and disseminating matter harmful to juveniles were against the manifest weight of the evidence and based on insufficient evidence.[1]
Specifically, Appellant has argued that the State failed to produce evidence of the harmful matter he allegedly disseminated and that the State failed to establish the force element of the rape counts. We disagree.
 {¶ 6} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citingState v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v. Jenks (1991), 61 Ohio St.3d 259, 279. Furthermore:
"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks, 61 Ohio St.3d paragraph two of the syllabus; see, also, Thompkins, 78 Ohio St.3d at 386.
 {¶ 7} In State v. Roberts, this Court explained:
"[S]ufficiency is required to take a case to the jury[.] * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at 4. (Emphasis omitted).
 {¶ 8} In determining whether a conviction is against the manifest weight of the evidence an appellate court:
"[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 9} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. at 388. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court.Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten,33 Ohio App.3d at 340.
Convictions
 {¶ 10} Appellant was convicted of two counts of rape in violation of R.C. 2907.02(A)(2). Pursuant to R.C. 2907.02(A)(2): "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 11} Appellant was also convicted of disseminating matter harmful to juveniles. R.C. 2907.31(A)(1) provides:
"No person, with knowledge of its character or content, shall recklessly do any of the following: (1) Directly sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile * * * any material or performance that is obscene or harmful to juveniles[.]"
Evidence and Trial Testimony
 {¶ 12} Prior to the start of trial, the parties stipulated to the DNA reports that seminal fluid was found on the alleged victim's underwear, but tests could not determine the source of the DNA. During the trial, the State presented testimony from four witnesses, beginning with the alleged victim Jennifer.
 {¶ 13} Jennifer testified to the following. Appellant is Jennifer's biological father; her parents divorced in 1991 when she was six years old. Appellant was in the Army when her parents were still married and the family lived in Germany and Texas. Jennifer could remember some parts of life in Texas. She specifically recalled that they were an unhappy family. Jennifer testified that there was a lot of physical fighting and arguments between her parents. Jennifer and her younger sister Jessica both witnessed the fights. Jennifer remembered Appellant's temper and how he was the aggressor in the fights with her mother. Jennifer testified that when she witnessed Appellant hit her mother it made her feel scared and frightened. Jennifer would also cry during the fights and Appellant would tell her that if she kept crying he would give her something to cry about.
 {¶ 14} Jennifer continued testifying to the following. Appellant disciplined Jennifer and her sister by intimidating them. Although he never carried out any of his threats, Appellant would threaten to hurt his daughters. After her parents were divorced, Jennifer would see Appellant a few times a month. Jennifer testified that she loved Appellant and that he would take her and her sister to the movies and other fun activities. Jennifer recalled a time when she was between eight and ten years old and Appellant showed her a magazine with a picture of a naked man and a naked woman standing by a waterfall and the man was behind the woman touching her; the "man was behind [the woman], and his hand reached around her front and was touching her vagina." Appellant was living with his grandmother at the time and Jennifer was living with her mother and stepfather. Jennifer and her sister were visiting Appellant and he took Jennifer into his room to show her the magazine. After showing Jennifer the picture, Appellant asked her what she thought about it and she said she did not know; she had no idea what it was.
 {¶ 15} Jennifer testified that when she was between the ages of 10 and 12 Appellant showed her a videotape. Jennifer was living with her mother in Amherst at the time and Appellant was living in an apartment in Pentemann Arms. Jennifer was reading the Guinness Book of Records; she and Appellant were alone in his apartment. Jennifer testified that Appellant told her he wanted to show her something and that "most parents wouldn't do this, but he feels that he has different teaching methods, and that they would be most effective. And [he] said that most parents don't show their kids pornography to teach them what sex is like." Appellant told Jennifer not to tell anyone about the video because "most people would disagree with his teaching methods." Appellant added "since he couldn't show [Jennifer] what sex was like, that he wanted to show [her] with a video." Jennifer testified that the video was on incest and was titled "Taboo" with numbers after it. The video showed a father and daughter having sex, a mother and son having sex, and a brother and sister having sex. Appellant told Jennifer the relationships between the people in the video. Jennifer testified that Appellant told her the point of her watching the video was for her to see what it was like for a woman to have an orgasm. Jennifer was nervous and stopped paying attention to the video, so Appellant rewound it and Appellant told her to watch the video, that he wanted her to watch it. Jennifer testified that during her sophomore year of high school, which was 2001, she was hospitalized for depression and she informed the hospital staff about watching the video and she was diagnosed with post-traumatic stress disorder.
 {¶ 16} When Jennifer was 12 or 13, Appellant talked to her about sex and gave her beer and wine. Appellant told Jennifer how he wished he wasn't her father so he could show her what sex was actually like. Jennifer didn't know what to think because she loved her father. Around the same time period, Appellant told Jennifer he wanted to show her something. He showed her a clip on the computer that he had downloaded; the clip showed a man being tied up, with a mask over his face. The man was wearing black and was handcuffed, with his hands above his head, and a woman came into the room and began "sucking on his genitals." The woman was wearing a black outfit and boots. Jennifer testified that the video did not show either person's genitals. After Appellant showed Jennifer the clip, he told her he just wanted to show it to her and then he returned to the kitchen to make dinner.
 {¶ 17} Jennifer testified that when she moved to Kentucky with her mother, stepfather, and sister, she spoke to Appellant a lot and visited whenever she was in town. Around the time Jennifer was 15 she began visiting Appellant during the summer and he did not exhibit any of his previous behavior towards her. When Jennifer graduated high school, her mother had a party and Appellant attended. After the party, Jennifer decided to return to Lorain for a visit and she rode back to Ohio with a friend that had come to the party. Jennifer was planning on staying with Appellant for her week long visit.
 {¶ 18} Jennifer testified to the following regarding the evening of June 16, 2003. Jennifer was staying with Appellant at his apartment and he was telling her about his sexual relationship with his ex-fiancé. Appellant told Jennifer how he would engage in threesomes and that it was taking more degrading activities for him to "get off." Jennifer did not respond to Appellant's comments, rather she just listened and wondered why he was telling her about his sex life. Jennifer did not say anything to Appellant because "after being with him for so long, you just learned that it was better not to question him." Jennifer and Appellant then decided to rent a movie and they rented Monsters, Inc. from the local Drug Mart. As soon as they returned to the car Appellant resumed talking about his sex life. When they got back to the apartment, they watched the movie. Appellant was drinking beer during the movie. During the movie, Jennifer noticed that Appellant was glancing over at her and that he was not really interested in the movie. After the movie Appellant started discussing his sex life again. Appellant told Jennifer that he had not had sex in a very long time. Appellant asked Jennifer if he could trust her and she said yes and he told her that being with her made him very vulnerable.
 {¶ 19} Jennifer continued testifying to the following. She started to get really nervous and began shaking because she did not know what to do. Appellant then asked Jennifer what she would do if he went over to her and pulled his pants down in front of her. Jennifer froze and said she did not know what she would do. Appellant did not say anything. He then went over to Jennifer, pulled his pants down, pulled his underwear down, put his hand behind her head, and brought her face to him. Appellant brought Jennifer's face to his penis and she pulled back and he pulled her forward again with his hand. Jennifer testified that Appellant then made her perform oral sex on him. Jennifer did not say no or tell Appellant to stop. When asked why she did not say no, Jennifer responded:
"I felt like if this man's sick enough to beat my mom, to do this to me, then what would stop him if I were to say no, Dad, please stop right now. I mean, I'm afraid that I would not be here today, because he could have — I mean, this is how I felt. I felt if he's sick enough to do this to me, then why wouldn't he try to stop me and say, you know, if I end up disappearing or something, and, I mean, he could have said, well, Jen was supposed to go out with Nikki. I mean, I was afraid."
Jennifer did not feel that she could have left the apartment; she felt that Appellant would have stopped her from leaving. Appellant's penis was erect when it was in Jennifer's mouth. Appellant then put his hand on Jennifer's shoulder and pulled away from her. With his hand still on Jennifer's shoulder, Appellant "made" Jennifer lay down on the couch and he removed her shorts and underwear and performed oral sex on her, penetrating her vagina. Jennifer's hands were on the couch during the incident and she was thinking that she wished it would end. Appellant then grabbed Jennifer by her wrist and told her that he wanted to go into his bedroom where there was more room. Appellant then made Jennifer lay down on his bed. Jennifer testified that the following transpired after she was on Appellant's bed:
"[H]e took my shirt off, and he makes me perform oral sex on him again, and then makes me use my hand on him. And he told me that he wanted to use this oil. And so he took the oil out from his nightstand, it was in this green box, and he took it out and he put it in my hand, and he had me by my wrist, and told me that he wanted me to use it on his penis."
After Appellant made Jennifer perform a "hand job" on him, he kissed her and told her that it felt right doing that. Jennifer did not kiss Appellant back; she was still. Appellant repeated that it felt right and said that he was going to continue doing it the whole week. Appellant told Jennifer he was glad it was happening then because then they could do it all week.
 {¶ 20} Jennifer testified that Appellant then got on top of her and had vaginal intercourse with her. During this incident, Jennifer's cell phone rang and she attempted to get up to answer it and Appellant told her no, that she was not going to get the phone because they were going to make the sex last. Appellant then asked Jennifer if he could "come" inside her and Jennifer said no. Appellant responded that he was afraid she would say that and he stopped having sex with her and laid on his back. Appellant then "made" Jennifer use her hand to make him ejaculate. Appellant ejaculated on the sheet, on himself, and on Jennifer's hand. Jennifer testified that from the time Appellant first made her perform oral sex on him until he ejaculated on his bed was probably 45 minutes to an hour.
 {¶ 21} Jennifer testified that after the incidents on Appellant's bed, she got up, went to the bathroom and washed her face and hands. She then got dressed and laid down on the couch. Appellant then came into the room and asked Jennifer if she was okay with everything that had happened. Jennifer did not respond. Appellant then asked Jennifer if she was going to tell anyone what happened and she said no.
 {¶ 22} When Jennifer woke up the next day, Appellant was not home. Jennifer took a shower and attempted to contact her friend Nikki, who lived in the area and had driven Jennifer up from Kentucky. Appellant came home and again asked Jennifer if she was going to tell anyone about what happened and she again responded no. Jennifer lied to Appellant because she was afraid that if she told Appellant she was going to tell that he would not let her leave; Jennifer was scared of Appellant. Appellant left again and Jennifer attempted to contact Nikki again. After several failed attempts, Jennifer called her friend Andrew in Kentucky and told him what happened. Jennifer was crying and very upset when she told Andrew and she did not know what to do. Andrew told Jennifer to get out of the house, but Jennifer wanted to leave the house in a way that Appellant would not suspect anything. While Jennifer was talking to Andrew, Nikki called and Jennifer was crying and told her to come over as soon as she could. Jennifer then went into the bathroom and put on makeup to hide the fact that he was upset and had been crying; Jennifer did not want Appellant to know that she had been upset.
 {¶ 23} Jennifer continued testifying to the following. Appellant and Nikki arrived at the house at the same time and entered together. Appellant and Jennifer talked about Appellant's job interview and then Jennifer told Appellant that she was going to help Nikki get ready for her graduation party. Appellant told Jennifer that was okay and to call him and let him know when she was coming home because they had things to do that day. As soon as Jennifer and Nikki got in the car to leave, Jennifer's mother called her and told her to go to her step-grandparents' house and then go to the hospital. Jennifer learned that Andrew had called Jennifer's mother and told her what happened with Appellant.
 {¶ 24} When Jennifer arrived at her step-grandparents' house, her step-grandfather called the police and told them what happened, the police instructed Jennifer to go to the hospital and the police would meet her there. At the hospital, Jennifer spoke with nurses and the police and told them what happened and she was instructed to go to the Rape Crisis Center to have a rape kit performed. Jennifer went to the Center and had the rape kit done.
 {¶ 25} Jennifer testified that she did not call the police after her father left the apartment because she was scared and she wanted to talk to someone she knew. Jennifer explained, "My mother was like 200 miles away from me, and I was scared, and I did not know what to do." Jennifer's mother came to Lorain the day she learned what happened and Jennifer returned to Kentucky the following day.
 {¶ 26} Jennifer testified that the oral and vaginal sex with Appellant was not consensual and she did not agree to have sex with him. She admitted she never said no or stop, but she testified that she was afraid if she did so he would hurt her. Jennifer testified that she did indicate that she did not want to have sex with Appellant by pulling away from him.
 {¶ 27} Jennifer testified that before the incidents with Appellant she enlisted in the Air Force and she reported for basic training on March 2, 2004. Jennifer was almost finished with basic training when she began waking up in the middle of the night thinking she was still in Appellant's apartment. She began having panic attacks and was sent to the unit's psychiatrist. Jennifer told the psychiatrist that she wanted to finish basic training, but the psychiatrist told her that the rigors of training were causing her flashbacks and panic attacks and she would not be able to finish basic training.
 {¶ 28} Before Jennifer was cross-examined, the trial court reviewed Jennifer's taped statement to the police for any inconsistencies with her trial testimony. The trial court reported that her statements to the police were consistent with her testimony. But it noted that one possible inconsistency existed over when Jennifer contacted Nikki on the cell phone.
 {¶ 29} Jennifer testified to the following on cross-examination. She was a 17 year old, high school graduate and enlisted in the Air Force when the incidents at issue occurred. Throughout the time Jennifer and her father were getting along, before June 16, 2003, she would speak to him on the phone and they would discuss their sex lives. Jennifer testified that at times she would call him and leave joking messages on his phone. When asked if she ever called and left a message stating that she could picture Appellant sitting in his house masturbating, Jennifer could not recall leaving the message, but answered that she could have left such a message. Jennifer testified that sexual conversations with Appellant did not occur on a regular basis, but they were not uncommon. No sexual activity occurred between Appellant and Jennifer when he gave her alcohol. Appellant never hit Jennifer or inflicted any type of corporal punishment. Jennifer's step-grandparents lived a couple of miles from Appellant's apartment and they would have picked Jennifer up if she called them. Appellant never threatened Jennifer during the oral or vaginal sex incidents.
 {¶ 30} Jennifer continued testifying to the following. Appellant did use force when he put her head back into position to continue performing oral sex on him. Jennifer said she would have resisted more but she felt he would have hurt her. Jennifer testified that watching Appellant beat her mother when she was younger was enough to make her not resist fully. Appellant told Jennifer to get on the bed and she did not feel that she had free will to disregard his orders. Although Appellant never told Jennifer she could not leave, she felt she could not leave his house that night. Jennifer did not tell the original police officer about Appellant touching her head or shoulder during the first oral sex incident. Jennifer testified that after watching her father physically abuse her mother "it was instilled in me as a child that he could physically do the same thing to me."
 {¶ 31} Nicole Smith ("Nikki") testified to the following for the State. Nikki has been friends with Jennifer since they were in the fifth grade. Nikki has known Appellant since she and Jennifer were freshman in high school. When Nikki and Jennifer were between 13 and 14 years old, Appellant gave Jennifer his credit card and instructed her to go to the mall and buy specific types and shades of make up so he could show her how to apply it to make her appearance better. Nikki attended Jennifer's graduation party in Kentucky and saw Appellant there. Nikki testified that while at the party Appellant was saying how he had not had sexual relations with anyone for a long period of time. Nikki gave Jennifer a ride back to Ohio and dropped her off with Appellant. One morning Nikki received a message from Jennifer and she returned her call and Jennifer was crying and upset. Nikki then went to Appellant's apartment and arrived at the same time as Appellant. The two entered the apartment together and Appellant went to Jennifer and asked her if she was going to ask him about his interview. Jennifer was applying make up in the bathroom and motioned for Nikki not to say anything. Nikki observed that Jennifer was not being her normal self, she was trying to ignore Appellant and remain calm. Nikki and Jennifer told Appellant they were going to plan Nikki's graduation party and that they would be back because Nikki had to go to work. When they got in the car, Jennifer was upset and crying. Her mother called her on her cell phone and while they talked Jennifer continued to cry. Jennifer's mother talked to Nikki and based on that conversation Nikki drove to Jennifer's step-grandparents' house. They were at that house for not more than 20 minutes and then they went to the hospital. Jennifer was still crying at her step-grandparents' house. Nikki also accompanied Jennifer to the Rape Crisis Center and back to her step-grandparents' house. Jennifer cried and was upset until she went to bed that night. Nikki spent the night with Jennifer at her step-grandparents' house and stayed with her when she met with the detective the following day and assisted in retrieving Jennifer's belongings from Appellant's apartment.
 {¶ 32} Karen Strnad ("Strnad") testified to the following for the State. Strnad is Jennifer's mother and Strnad was divorced from Appellant. Strnad knew Appellant since they were 12 and 13 years old and they dated on and off during high school. The two married a year after Strnad graduated high school, which was 1984. Appellant was in the Army and he was stationed at Fort Campbell in Kentucky. Appellant and Strnad had a turbulent relationship before they were married and the problems continued once they were married, specifically, Appellant would hit Strnad. The situation did not improve when Jennifer was born. Jennifer witnessed Appellant yelling at Strnad and being physically aggressive, destroying things in the home. Although Strnad did not believe Jennifer witnessed the actual incident, one time Appellant hit Strnad's head into a brick wall leaving Strnad badly bruised and with a cut on her head, injuries which Strnad knew Jennifer saw. One evening when the family was living in Texas, Appellant became angry at Strnad and threw her across the kitchen, Jennifer started crying and Appellant told her to be quiet and then slapped her face.
 {¶ 33} Strnad continued testifying to the following. When Jennifer was in therapy, Strnad learned that Appellant had shown her a pornographic video and Strnad confronted Appellant about it. Appellant admitted showing Jennifer the video and told Strnad it was for sexual education. Strnad testified that she did not know why she did not inform the police about Appellant showing Jennifer a pornographic video.
 {¶ 34} Detective Mark Carpentiere of the Lorain Police Department ("LPD") testified to the following. Det. Carpentiere investigated Jennifer's sexual assault allegation against Appellant. He spoke with Jennifer about the assault for five to ten minutes and then decided to make contact with Appellant. Det. Carpentiere and another detective went to Appellant's apartment and Appellant agreed to go the police station for questioning. After Appellant waived his Miranda rights, Det. Carpentiere explained the sexual assault allegations Jennifer made and Appellant denied the allegations. Appellant did admit having sexual conversations with Jennifer on June 16, 2003. Det. Carpentiere explained to Appellant that Jennifer alleged oral and vaginal sex occurred and Appellant told him "well, I can tell you that I know intercourse didn't take place[.]" Appellant told Det. Carpentiere that he had been drinking and he was unable to function sexually after drinking. Over the course of the two hour interview, Appellant admitted that oral sex might have happened. Appellant would not confirm that it did happen or say that Jennifer was lying, he insisted on using the word "might." Appellant explained that his drinking may have impaired his memory. When confronted with the fact that if Jennifer was not lying, then what she alleged must have happened Appellant responded that he did not remember and it might be true. At some point in the interview, Appellant mentioned something about committing a felony and Det. Carpentiere told him the allegations were felonies.
 {¶ 35} Det. Carpentiere continued testifying to the following. Appellant stated he had six beers. Appellant was asking Det. Carpentiere questions about the court process, being arrested, and going to jail. Appellant insisted that Det. Carpentiere use the word "might" regarding the occurrence of oral sex and he read the detective's notes as he wrote them to ensure he used the word "might." Appellant denied vaginal intercourse occurred. Appellant did ask how Jennifer was during the interview, asking how she was feeling and if she was crying. Appellant also asked if Jennifer was hurt. Appellant told Det. Carpentiere to apologize to Jennifer for him for anything that "might" have happened. Det. Carpentiere thought Appellant was manipulative and evasive during the interview and that Appellant was trying to control the interview.
 {¶ 36} At the end of the interview, Appellant asked Det. Carpentiere if he could talk to him again the next day and the detective agreed. The following day, June 18, 2003, Appellant waived his Miranda rights again and Det. Carpentiere conducted another interview. Appellant did not change his statement from the previous day and when Det. Carpentiere told Appellant he wanted his consent to enter and search his apartment Appellant told him he wanted to consult an attorney and would not provide consent. Det. Carpentiere informed Appellant that he was going to obtain a search warrant. After obtaining the search warrant, Det. Carpentiere went to Appellant's apartment and seized six beer bottles; a bottle of Oil of Love, Kama Sutra, Raspberry Kiss; Appellant's bed sheets and pillow cases; and the underwear, sports bra, and shirt Jennifer had been wearing.
 {¶ 37} Det. Carpentiere testified to the following regarding what he learned from his interview with Jennifer. He learned there was physical force involved because Appellant pushed Jennifer's head. He also based his conclusion of force on the fact that Appellant was Jennifer's biological father and she feared him based on incidents of physical violence she witnessed as a child. Det. Carpentiere also learned of the video incident and based on Jennifer and Strnad's statements and an Adelphia Cable bill he was able to pinpoint that Jennifer was shown the pornographic video between December 1996 and December 2000, which was when Jennifer was 11-15 years old.
 {¶ 38} After the admission of several exhibits, the State rested its case. Appellant then made a Crim.R. 29 motion regarding the two rape counts and the disseminating material harmful to a juvenile count. The trial court denied Appellant's motion and Appellant called one witness in his case in chief.
 {¶ 39} Appellant called Officer Arce of the LPD as his sole witness and he testified to the following. Officer Arce was questioned on a report he made regarding Jennifer's alleged sexual assault. When asked if the report referenced force or threat of force, Officer Arce answered that there was no allegation of force in his report.
 {¶ 40} Officer Arce testified to the following on cross-examination. His job regarding the instant matter was to take the initial report without going into too much detail and then hand the report over to a detective for further investigation. The report did show that Appellant asked Jennifer how she felt about him fantasizing about having sex with her; the question made Jennifer uncomfortable and nervous. Officer Arce's report also stated that Appellant took off Jennifer's shorts and underwear, she did not remove them herself and that he "told" Jennifer to give him oral sex. The report also reflected a previous statement by Jennifer that Appellant held her by the hand and took her to his bedroom. Officer Arce did not recall asking Jennifer if "force" was involved.
 {¶ 41} Upon questioning by the court, Officer Arce testified that the fact that his report did not contain mention of force or threat of force did not mean that there was no force or threat of force.
 {¶ 42} Appellant then called Jennifer back to the stand, as his witness. Appellant presented Jennifer with the written report from the Rape Crisis Center and asked her about her statements in the report. Specifically, Appellant focused on the lack of the word "force" in the report. Jennifer testified that she told the nurse what happened, but had a more detailed conversation about the events with Det. Carpentiere. Jennifer said she was still in shock when she talked to the nurse and did not provide much detail of the assault. Jennifer testified that she did not report any force to Officer Arce and the nurse because she was scared.
 {¶ 43} Jennifer testified to the following on cross-examination. Her conversation with Det. Carpentiere was over an hour and she spoke with Officer Arce for no more than 10 minutes. During her conversation with Officer Arce, Jennifer was still upset and crying.
 {¶ 44} Appellant then rested his case and the State called Det. Carpentiere as a rebuttal witness regarding Appellant's suggestions that Jennifer made up the force allegations after meeting with him.
 {¶ 45} Det. Carpentiere testified on rebuttal that he did not influence Jennifer in her statement and she told him there was force involved in this matter.
 {¶ 46} Without questioning Det. Carpentiere again, Appellant rested his case and renewed his Crim.R. 29 motion. The trial court denied the motion and the matter proceeded to closing arguments.
Rape Conviction
 {¶ 47} Appellant has argued that the State failed to produce evidence of force. We disagree.
 {¶ 48} While R.C. 2901.01(A)(1) defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing[,]" the Ohio Supreme Court has explained that the force element of rape need not be established by rough, physical actions. "As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." State v.Eskridge (1988), 38 Ohio St.3d 56, 59, citing State v. Martin
(1946), 77 Ohio App. 553; see, also, State v. Arias, 9th Dist. No. 04CA008428, 2004-Ohio-4443, at ¶ 32. Furthermore, "[f]orce need not be overt and physically brutal, but can be subtle and psychological." (Citations omitted.) Eskridge,38 Ohio St.3d at 58. When examining whether the State has proven the element of force, one must consider the entire situation and the relationship of the parties, especially if a parent-child relationship exists. Eskridge, 38 Ohio St.3d at 58.
 {¶ 49} Based on the entire situation and the father-daughter relationship between Appellant and Jennifer, we find the trial court did not lose its way when it found the State had proven the force element of the rape charges. As set forth in Eskridge andArias, force need not be physical. Eskridge and Arias,
supra. While not an exhaustive list, we found the following testimony relevant in our determination that the evidence established Jennifer's will was overcome by fear: Jennifer repeatedly witnessing Appellant physically abuse her mother; Appellant threatening violence when Jennifer was young; Appellant's violent temper; Jennifer not only being away from home, but in a different state and the fact that she was staying in the residence where the assaults occurred; Jennifer fearing Appellant and that he would hurt her if she said "no" or "stop"; Jennifer thinking that Appellant could make her disappear if she made him angry; and Jennifer feeling she not could leave because Appellant would have stopped her. In accordance with Eskridge
and Arias and weighing all the evidence and all reasonable inferences we find that the testimony concerning Jennifer's fear of Appellant satisfied the force element of rape.
 {¶ 50} Moreover, we find that the record also established force by the traditional definition of actual physical force. A review of the record shows that Jennifer's trial testimony provided ample evidence of physical force. Specifically noteworthy was the following testimony: Appellant undressed himself, put his hand behind Jennifer's head, brought her face to his penis, and when she pulled away he pulled her head forward again; Jennifer's testimony that Appellant "made" her perform oral sex on him and use her hand on him; Jennifer's testimony that Appellant "made" her lay down the couch and then he removed her shorts and underwear;[2] Appellant grabbed Jennifer by the wrist and took her to his room, had her lay down on his bed and then he removed her shirt; while in Appellant's bedroom, he again grabbed her wrist and told her to use oil on him; Appellant got on top of Jennifer and engaged in vaginal intercourse; when Jennifer's phone rang during the vaginal intercourse Appellant would not allow her to get up to answer it; and Jennifer's testimony that none of the sexual acts were consensual.
 {¶ 51} Based on the foregoing, we find that the State proved force due to Jennifer's will being overcome by fear and by Appellant's physical actions.
Disseminating Conviction
 {¶ 52} Appellant has argued that his conviction for disseminating material harmful to a juvenile is against the manifest weight of the evidence and not based on sufficient evidence because the "material" in question was never presented to the trial court. We disagree.
 {¶ 53} A conviction under R.C. 2907.31(A)(1) does not require that the material in question be presented to the trial court. Evidence of the content of the material can be established through testimony describing the material. Neither the statute nor the case law requires the actual material be produced and presented as evidence at trial. Specifically, this Court has held that "to convict a defendant for a violation of R.C.2907.31(A)(1), the State must prove beyond a reasonable doubt that the defendant: 1) recklessly 2) disseminated or presented 3) any harmful material 4) to the victim 5) who was a juvenile."State v. Morrison, 9th Dist. No. 21687, 2004-Ohio-2669, at ¶10, citing State v. Mayes (July 26, 2000), 9th Dist. No. 99CA007388, at 9. Like in the case sub judice, evidence of the harmful material in Morrison was presented through the testimony of the victims, not actual production of the material. This Court did not require the State to produce tangible evidence of the material in Morrison and we do not require such evidence in this case. We affirm our precedent that the State does not have to produce tangible evidence of the material disseminated to the juvenile and that testimony concerning the content of the material is sufficient to establish that its content was harmful or obscene. See Morrison, supra.
 {¶ 54} We next review whether the material described by Jennifer constituted material harmful to a juvenile. As previously discussed, Jennifer testified that Appellant showed her a video about incest. Specifically, the video was titled "Taboo" and had some numbers after it. Jennifer testified that the video showed a mother having sex with her son, a father having sex with his daughter, and a brother and sister having sex. Jennifer also testified that she tried not to watch the video, but Appellant rewound it and made her watch it. Appellant also told Jennifer not to tell anyone because they wouldn't agree with his "teaching" methods. We agree. It is obvious to this Court that having one's daughter watch a video depicting parents having sexual intercourse with their children and children having sexual intercourse with their siblings is harmful to said daughter and obscene. Moreover, when confronted about showing Jennifer the pornographic video Appellant admitted it.
 {¶ 55} Appellant has also argued that Jennifer's age was not established properly. We disagree, Jennifer testified that she was between the ages of 10 and 12 when she saw the video and Det. Carpentiere testified that based on where Appellant was living at the time in question Jennifer was between the ages of 11 and 15 when Appellant showed her the video.
Decision
 {¶ 56} Based on the foregoing, we cannot find that the trial court lost its way when it found Appellant guilty of two counts of rape and one count of disseminating material harmful to a juvenile. After weighing all the evidence, we find that the State proved all the elements of each crime. Accordingly, we cannot say that the Appellant's convictions for rape and disseminating material harmful to a juvenile were against the manifest weight of the evidence. As previously stated, "a determination that [a] conviction is supported by the weight of the evidence [is] also * * * dispositive of the issue of sufficiency." Roberts, supra at 4. Therefore, having found that Appellant's convictions were not against the manifest weight of the evidence, this Court need not discuss further his challenge to the sufficiency of the evidence.
 {¶ 57} Appellant's first and second assignments of error lack merit.
 III {¶ 58} Appellant's two assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Slaby, P.J., Carr, J., concur.
[1] Appellant has not appealed his sexual battery convictions. Accordingly, we will not address those convictions.
[2] In Eskridge, the Supreme Court found the defendant's acts of removing the victim's underwear and placing her on the bed were acts of compulsion and constraint that were separate from the actual rape itself. Eskridge, 38 Ohio St.3d at 58.