DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Sherman Williamson has appealed his conviction in the Lorain County Court of Common Pleas of rape. This Court affirms.
 I {¶ 2} On April 26, 2005, Defendant-Appellant Sherman Williamson was indicted on ten counts of rape, in violation of R.C. 2907.02, felonies of the first degree and eight counts of gross sexual imposition, in violation of R.C. 2907.05, felonies of the third and fourth degree. Appellant was arraigned on May 18, 2005 at which time he waived reading of the indictment and entered a plea of "not guilty" to all counts. On February 16, 2006, the State dismissed the counts of gross sexual imposition and the matter proceeded to a jury trial on ten counts of rape. The jury trial commenced on February 15, 2006. On February 17, 2006 the jury returned a verdict of guilty as to all counts in the indictment. On March 3, 2006, the trial court sentenced Appellant to an aggregate term of 21 years incarceration.
 {¶ 3} Appellant has timely appealed, asserting one assignment of error.
 II Assignment of Error
"THE VERDICT OF THE JURY FINDING SHERMAN WILLIAMSON GUILTY OF RAPE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 4} In his sole assignment of error, Appellant has argued that his convictions were against the manifest weight of the evidence. We disagree.
 {¶ 5} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 6} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the fact finder's resolution of the conflicting testimony. Id. We note that "[t]he discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction." Otten, 33 Ohio App.3d at 340.
 {¶ 7} Appellant was convicted of ten counts of rape, in violation of R.C. 2907.02, felonies of the first degree. For purposes of this appeal, to be convicted of rape, a defendant must have engaged in sexual conduct with another (1) by purposely compelling the victim to submit by force or threat of force, or (2) if the victim is less than thirteen years of age, regardless of whether the defendant knows the victim's true age. R.C.2907.02(A)(2)/(A)(1)(b).
 {¶ 8} Sexual conduct is defined as:
"[V]aginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).
With regard to the force element, this Court has stated:
"While R.C. 2901.01(A)(1) defines force as `any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing' the Ohio Supreme Court has explained that the force element of rape need not be established by rough, physical actions. `As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.' Furthermore, `[f]orce need not be overt and physically brutal, but can be subtle and psychological.' When examining whether the State has proven the element of force, one must consider the entire situation and the relationship of the parties, especially if a parent-child relationship exists." (Internal citations omitted). State v.Toth, 9th Dist. No. 05CA008632, 2006-Ohio-2173, at ¶ 48, citingState v. Eskridge (1988), 38 Ohio St.3d 56.
 {¶ 9} During the trial, the jury heard the following testimony regarding the rape charges. One of the victims, J.W. testified to the following. She is Appellant's daughter and lived with him until she was almost sixteen years old. Appellant first touched her when she was nine or ten years old and living in Lorain. Appellant was in his bedroom and he told her to come inside through the back door connecting his bedroom to the yard. J.W. testified that the interior door to Appellant's bedroom was closed and that he touched her on her breast and buttocks both over and under her clothes. Appellant also forced her hand onto his penis.
 {¶ 10} J.W. further testified that approximately two weeks after the touching incident, Appellant told her to come into his bedroom, laid her on the bed and began kissing her. She tried to squirm away, but he had his arms on her shoulders pressing her down. At that time, Appellant removed her underwear and had vaginal intercourse with her. Approximately three weeks after the initial touching, Appellant entered the bathroom while she was taking a bath and put his penis in her mouth. Appellant forced her to perform oral sex on him approximately 30-40 times until she started working at a Denny's at age sixteen.
 {¶ 11} J.W. testified that the vaginal sex would occur once or twice per week from the time she was nine or ten until she was almost sixteen. The intercourse mostly occurred in Appellant's bedroom and while her mother was not home.
 {¶ 12} J.W. testified that the family moved to South Carolina and while living there, she grew tired of Appellant's looks and comments and ran away. Appellant never touched her while the family was living in South Carolina. J.W. ran to Ohio and stayed with her oldest sibling, step-sister T.R. While staying with T.R., J.W. divulged that Appellant had abused her and learned that T.R. had been abused as well. Eventually, J.W. returned to South Carolina and lived in a foster home.
 {¶ 13} J.W. testified that she hated living in the foster home and that she missed her mother and her siblings. She related these feelings to her mother and her mother told her that if she recanted, she would be able to return and live with the family. J.W. then lied to Children's Services and told them that nothing happened between her and Appellant. J.W. moved back in with her parents and Appellant did not touch her or threaten her during that time.
 {¶ 14} On cross examination, J.W. testified to the following. She remembered the times that the abuse occurred, but not exact dates. During the time period in which she was allegedly molested, a total of nine people lived in the home and the house was crowded. After returning to South Carolina, J.W. told her social worker that she lied about the abuse by Appellant in an effort to be able to stay with her boyfriend at the time, Ricky Barlow. J.W. also testified that she lived in the house on Grant Street in 2002, although she had testified on direct examination that the first incident of molestation occurred on Grant Street in 1997 or 1998. J.W. never contacted the authorities because she was frightened and did not think that anybody would believe her. She only returned home to live with her family because her mother assured her that Appellant was not living there. Appellant was living there, but was never home, so J.W. stayed.
 {¶ 15} On redirect, J.W. testified that Appellant had his own bedroom and that the abuse took place in his bedroom, her bedroom, or the bathroom where they would be alone. J.W. testified that she was unaware of the timeframe in which T.R. alleged to have been molested. J.W. testified that it was not unusual for her family to live in different houses on the same street, but could not remember if they lived on Grant Street on more than one occasion. She could not remember the exact dates and times of the abuse because it happened so often and when she was so young. Although her mother had hit her and was mean to her, she had never made up any stories about her mother molesting her.
 {¶ 16} T.R., Appellant's step-daughter and the second victim, testified to the following. She had prior criminal convictions for passing bad checks and theft and pending charges. However, she denied making any agreement to testify in exchange for her release from prison. T.R. testified that she lived with Appellant from the time she was an infant until sixteen years of age. Overall, Appellant was a good father, and although there was some physical abuse, she loved him. Over the course of her childhood the family moved numerous times and lived in at least fifty different homes. The family moved three to four times per year. The family sometimes lived on the same street, but in different houses.
 {¶ 17} T.R. testified that the sexual abuse began when she was twelve. The abuse began as touches or "swipes" on her breasts over her clothing. It then progressed to under the clothes. Eventually, it turned to intercourse. T.R. testified that the first time Appellant had intercourse with her, she was vacuuming the living room and all of her brothers and sisters were home. Appellant asked her to put the kids down for a nap and then come in and vacuum his bedroom. When she went into the bedroom to vacuum, Appellant began to fondle her breasts and then asked her to take her clothes off and lay on the bed. She refused. Appellant pulled her pants down and pulled her panties to the side. Appellant kissed her on the check, neck and lips and began having intercourse with her. Appellant put a pillow over her face and told her to quiet down.
 {¶ 18} T.R. testified that the sexual abuse would happen two to six times per week, depending on how often her mother was home. During the abuse, the other children were napping, or outside playing, or at school. The abuse usually happened in the Appellant's bedroom or bathroom.
 {¶ 19} T.R. also testified that Appellant forced her to perform oral sex on him. She usually resisted, but he would grab her head or hair and force her head to his penis. The oral sex happened approximately two to three times per week in addition to the intercourse. Although Appellant was never overtly physical with her during the incidents, he often threatened T.R. with losing privileges that were valuable to her, such as visiting friends or close relatives. The abuse eventually ceased after T.R. moved in with her grandmother, who had obtained guardianship of her.
 {¶ 20} T.R. testified that she remained silent about the abuse out of fear of Appellant and the belief that nobody would believe her. T.R. did not tell anyone about the abuse until J.W. ran away from South Carolina and showed up at her doorstep. J.W. told her that Appellant had been physically and sexually abusing her. T.R. confided that she too had been abused. Shortly thereafter, detectives arrived looking for J.W. in response to a phone call from the girl's mother that J.W. had been kidnapped by Ricky Barlow. Detective Mark Carpentiere spoke on the phone with the girls' mother and she told them to allow J.W. to stay with T.R. while they made arrangements to transport her back to South Carolina.
 {¶ 21} T.R. testified that they told Detective Carpentiere about the abuse while he was at her apartment. Detective Carpentiere told them to go to the police station to fill out a report, which they did. J.W. stayed with T.R. for approximately three months. At that point, T.R. called Children's Services and told them that she could no longer care for her sister because she was not working. T.R. denied that their relationship was strained. Subsequently, Children's Services sent J.W. to a foster home in South Carolina.
 {¶ 22} On cross examination, T.R. repeated that there had been no talk of her testifying in exchange for her release from jail. She testified that she had always shared a room with her sisters J.W. and Stephanie. She lived in the house on Grant Street when she was seventeen, which was after the time she said she had moved in with her grandmother. Although the abuse happened five to ten times per week, nobody ever caught them in the act.
 {¶ 23} T.R. testified that she and Appellant sometimes fought over her seeing her biological father and she somewhat resented him for it. She felt that, for the most part, Appellant treated her in the same way as his biological children. Appellant showed his favoritism by allowing J.W.'s boyfriend to live in the family residence but not allowing T.R.'s boyfriend to do the same. Despite moving in with her grandmother at age seventeen, T.R. continued to live with her family until she was twenty years old and even moved with them to Arizona and West Virginia. Appellant was in an accident in 1999 and he never abused her after that.
 {¶ 24} On redirect, T.R. testified that although her mother did not work often, she was often away from home because she was a "shop-a-holic." Appellant continually gave her mother money to go out shopping. T.R. confirmed that she had never seen the indictment and had no idea what dates were contained within the indictment. T.R. and J.W. did not sit down and collaborate to get their stories straight. In fact, T.R. had no knowledge that J.W. had been molested after Appellant's accident. T.R. testified that she returned to live at home voluntarily because she had nowhere else to go.
 {¶ 25} T.R. testified that the prosecutor only told her to tell the truth and did not tell her to make anything up or put words in her mouth. She did not make any deals with the prosecutor regarding her testimony.
 {¶ 26} On re-cross examination, T.R. testified that her father gave her mother money. She testified that she was fired from Marc's for conspiring with her brother to sell him a stereo for less than what was marked. She admitted that she had skipped bond on a pending charge and had fled authorities for two to three months. However, she eventually turned herself in.
 {¶ 27} Jane Robertson of the Lorain County Children's Services ("CSB") testified to the following. She is the manager of the Family Based Care Department and has twenty years experience. CSB prefers to keep children in the home because they develop best growing up with their family. Even in instances of abuse, most children do not want to leave their family. Delayed disclosure is a dynamic of sexual abuse cases and simply means that victims tend to disclose the abuse at some point after the abuse, ranging from weeks to months to years. Disclosure predominantly takes two forms: accidental and purposeful. Purposeful disclosure usually happens when children develop emotionally and are able to understand the abuse and discuss it with somebody.
 {¶ 28} Children often fail to disclose out of fear of retribution. Often the perpetrator will use something valuable to the child as leverage. Children also fear the unknown, fear talking to strangers, fear that no one will believe them, and these fears are played upon by perpetrators who often tell the victim that no one will believe them. In her experience, an exceptionally high percentage of sexual abuse cases are delayed disclosure cases.
 {¶ 29} Recantation is also a common dynamic in sexual abuse cases, especially in cases where there is an older child involved who is sent to foster care, a relative, or third party where there is no support system. Recantation is so prominent in such situations that CSB anticipates a recantation. Often a child who has been removed from their family and placed in a cold, non-supportive environment sees a realization of the fear that nobody will believe them.
 {¶ 30} Ms. Robertson testified that it is not unusual for abused children to state that they still love their parents. The parent-child relationship is a difficult one to sever. It is common to see an abused child go back to the home once they have achieved adulthood. Although it is difficult to understand, oftentimes an abused child who does not receive proper treatment will strive to remain close to the family. Children often recant because it is easier and less traumatic to go back to the familiar environment, even an abusive one, than to open up to a group of strangers and face the embarrassment.
 {¶ 31} On cross examination, Ms. Robertson conceded that her testimony was based on generalities and research and that she had no information concerning the parties. She testified that on one occasion in her career, she had an alleged victim lie about sexual abuse.
 {¶ 32} On redirect, Ms. Robertson clarified that she was not testifying as to whether the abuse happened or whether the victims were telling the truth
 {¶ 33} Detective Mark Carpentiere of the Lorain Police Department testified to the following. He has thirteen years experience as a detective and has investigated approximately 700 to 800 child sexual abuse cases. Delayed disclosure is a common phenomenon in his experience. In his experience, children often have difficulty remembering dates and times of the abuse, especially when the abuse occurred in the distant past.
 {¶ 34} Detective Carpentiere first became involved in the case when he received a call from the girls' mother in South Carolina relaying that J.W. had been kidnapped by Richard Barlow. He located Barlow and learned that J.W. was at T.R.'s apartment. Upon finding J.W. at T.R.'s apartment, he contacted the mother and it was decided that J.W. could stay with T.R. for the time being. He first learned of the sexual abuse allegations when CSB contacted him the next day. He met with the girls and interviewed them separately regarding the abuse.
 {¶ 35} Detective Carpentiere testified that it was difficult establishing a timeline because of all the places the family had lived. The Lorain Police Department database listed fifteen known addresses and that only included the addresses from which the family had contacted the police.
 {¶ 36} Based upon our review of the record, this Court cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it found Appellant guilty of rape. See Otten, 33 Ohio App.3d at 340. Initially, we note that there is ample evidence in the record upon which a jury could discredit Appellant's theory that J.W. and T.R. concocted these allegations as some form of misguided retribution. The evidence indicates that Appellant treated all of his children relatively alike and that T.R.'s strained relationship with Appellant over the role of her biological father was exaggerated. Further, there is no evidence to support the claim that J.W. fabricated the allegations in response to her parents' kidnapping complaint against Ricky Barlow. To the contrary, J.W. informed authorities of the abuse after it became apparent to all concerned parties that Barlow had not kidnapped her and after her mother had given her permission to stay with T.R. It does not appear from the record that either girl had "obvious motivations" to frame Appellant for rape.
 {¶ 37} Further, the record indicates that during the trial, much as on appeal, Appellant sought to diminish the credibility of J.W. and T.R. and to portray their claims as outlandish and unbelievable. However, it is axiomatic that issues of credibility are within the purview of the jury. This Court will not overturn a conviction because the jury chose to believe the testimony offered by the prosecution. See State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at *2. This Court has held that, "in reaching its verdict, the jury is free to believe, all, part, or none of the testimony of each witness." Prince v. Jordan,
9th Dist. No. 04CA008423, 2004-Ohio-7184, at ¶ 35, citing Statev. Jackson (1993), 86 Ohio App.3d 29, 33.
 {¶ 38} As the finder of fact, the jury was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported a finding of guilt. See State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Thus, this Court will defer to the factfinder's judgment on matters of credibility. State v.Young, 9th Dist. No. 22636, 2006-Ohio-68, at ¶ 35, citing Statev. Lawrence (Dec. 1, 1999), 9th Dist. No. 98CA007118, at *6.
 {¶ 39} The jury heard the testimony, measured the credibility of the witnesses and the believability of their stories. They listened to Ms. Robertson and Detective Carpentiere testify regarding the commonness of delayed disclosure and the frequent inability of child victims to remember the dates, times, and details of their abuse as adults. They heard J.W. and T.R.'s explanations for their behavior, their inconsistencies, and in T.R.'s case, their criminal conduct. After contemplating everything that they saw and heard the jury chose to believe the victims. There is nothing in the record that would compel this Court to disagree with that conclusion.
 {¶ 40} Accordingly, we conclude that Appellant's convictions were not against the manifest weight of the evidence.
 {¶ 41} Appellant's assignment of error lacks merit.
 III {¶ 42} Appellant's sole assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Slaby, P.J. Boyle, J. Concur.